In the matter of BENJAMIN TAYLOR'S WILL.

The fact that on the execution of a commission *de lunatico inquirendo*, the testator was found insane, does not of itself establish an incompetency to make a will. The question of testamentary capacity is still open for inquiry.

But the fact of being thus adjudged, and that testator died insane, throws the burden of proof of testamentary capacity on those who propound for probate a will executed between those periods.

THIS was an appeal from a decree of the surrogate of New York, admitting to probate the will of Benjamin Taylor, who died in New Haven, Connecticut, in January, 1845, aged about 83 years.

In 1803 his first wife, by whom he had four children, died.

From 1804 to 1816 he cohabited with the appellant as his wife, and by her had three children. He then went abroad and remained there some ten years, leaving the appellant in charge of his household, and his other children, and supporting that establishment.

On his return from abroad, he went to live with the children of his first wife, in New Haven, the appellant, who claimed to be his second wife, living with her children, and supported by him in New York.

On the 10th April, 1843, at New Haven, Taylor made a will, wherein he made a bequest "to Ann Cornell, my late housekeeper, but who was never my wife," etc., etc., and gave the bulk of his estate to the children of his first wife.

In July and September, 1841, while he was thus living with his children in New Haven, such proceedings were taken by those children, that he was declared, by the courts of Connecticut and New York, to be insane, and the husband of one of his daughters was appointed conservator of his estate in

Connecticut, and his New York estate was put into the custody of the New York branch of his family.

In January, 1845, he died insane.

On the appeal, which was argued by Howes for appellant, and J. Anthon for respondents, the questions discussed were, the testamentary capacity of Taylor, and undue influence.

*The Circuit Judge:* In July and September, 1841, Taylor was declared by the courts of New York and Connecticut, to be insane, and the management of his property was taken from him. On the 23d January, 1845, he died insane.

In March and April, 1843, he made a will and codicil, giving the bulk of his property to the children with whom he lived, and cutting off, in a measure, one of his children by his first wife, and all the children by her who is claimed to have been his second wife.

It is admitted, on all hands, that he was insane in 1841, and at the time of his death in 1845; that he was about 83 years of age, and very infirm and feeble at the time of making his will, and the question is whether he was at that time capable of making a will.

The first thing that strikes me, is that this is an attempt, never regarded with favor, of a parent to bastardize his own offspring. For years he allowed the appellants to regard themselves as his legitimate children, and to bear his name. He allowed their mother to bear his name, to be regarded as his wife, to bring up the children of his first wife, and until the close of his life seems to have bestowed upon her and her children the same care and attention that he had given to his other children, and to their mother, and it is only after he had been thus declared insane by two courts, and after the children of his first wife had got entire possession of him, that he makes this ungracious attempt of fixing the stain of illegitimacy upon those who are confessedly his children.

He had a right to do this, undoubtedly, if he was in possession of a mind competent to judge of the act he was doing.

But the inquiry naturally suggests itself, why this sudden change in his mode of treating these children and their mother thus, at the close of his life? Was it the product of a sound mind, reasoning clearly from cause to effect, and properly appreciating the misfortune he was bringing upon his acknowledged children, or was it one of those freaks to which the insane are peculiarly liable, or was it the yielding of a feeble and prostrated mind to the influences of younger and more energetic understandings?

The surrogate was right in saying that neither the proceedings in the Court of Chancery here, nor in the court of probates in Connecticut, were an adjudication upon the question of sanity, at the time of making this will. But a different conclusion from that entertained by him forces itself from this fact upon my mind, and I feel myself called upon to examine minutely the testimony, and determine the question of sanity from that, as a new question, not controlled or disposed of by those proceedings.

It seems, from the evidence, that from about 1837 till he died, in 1845, the testator lived with his three daughters and his son-in-law, Hammond, in New Haven—his five other children and his wife living in New York.

In 1841, Hammond and the daughters in New Haven attempted to get possession of his property. They succeeded in Connecticut; Hammond was appointed the conservator, giving one of his sisters-in-law as one of his sureties. They made the same attempt in New York in regard to the property here, but in that they were defeated. The insanity was made out here, chiefly on the testimony of Hammond and the daughter who had been his surety in Connecticut, but the custody of the property was given to the New York branch of the family.

In their testimony here, Hammond and his sister-in-law stated that the insanity had endured from February, 1841; and from that time until one of the sureties of Hammond, in Connecticut, petitioned for his removal, and he resigned, Hammond and the daughters in Connecticut treated the testa-

tor as unsound. But directly after that resignation — after Hammond, by his defeat here, and his removal in Connecticut, had lost all control over the property, the attempt was made to establish his sanity and to remove the disability which they had themselves established. And in December, 1842, a decree establishing his sanity went by default in Connecticut, as the decree establishing insanity had gone by default in the same court in July, 1841.

An attempt was then made to remove the disability in New York. The testator was brought to New York, and they who had him in their custody, had no longer any thing to gain, but much to lose, by having his insanity established. And it is worthy of remark that he who in September, 1841, had testified that the difficulty with this old man of fourscore, was that " there appeared to be a breaking up of his mental faculties," and that he was as " easily controlled as a child," was now, in May, 1843, when the testator had grown older and more infirm, attempting to show that his mental faculties had not broken down, and he was not as easily controlled as a child. If he was restored to his mental powers — if the two years which had been added to the long life of this feeble old man had brought vigor of intellect with bodily decrepitude, it is certainly ground of suspicion, if not of surprise, that while here, he should so carefully be secluded from his wife and children in New York, and that he and his advisers should so abruptly reject the very reasonable test proposed by the chancellor.

At that time he had made this will, and they who had him in their charge had every inducement to submit him to such an examination, unless perchance there was danger that that examination might establish insanity too plainly, and at an inconvenient period.

It may be, however, that this behavior in New York grew entirely out of the volition of the testator. Yet I cannot avoid looking upon the whole proceedings with suspicion.

For three or four years before his death the testator was kept very much secluded by H. and his family; access to him

In the matter of Benjamin Taylor's will.

was denied by them to his children and his old friends; and when control over his property was obtained, H. misapplied it; appropriated it to the payment of his own debts; suffered the testator to be rendered liable for large sums of his debts; avowed his intention to get the property away from the children in New York; and when his surety, becoming alarmed, charged him with mismanagement, he quietly submitted to the charge, resigned his post, and rendered an account of his trust, which was unquestionably false.

It was he who selected the person to draw the will. It was he who furnished the writer with the directions as to what it should contain. It was he who introduced into the house the witnesses by whom it was to be established, and it was he and his that were most to be benefited by it, if it should be established.

These circumstances have surrounded this paper with suspicion and doubt, which it is my duty carefully and heedfully to regard.

I. The evidence in support of the will: —

1. I remark as somewhat singular, that the witnesses were all persons who had only occasionally seen the testator. No one was produced who, during the lapse of two or three years, had seen him daily, and at all hours of the day, and in all moods of his mind. Only when permitted by the family, and, for aught we know, at most favorable moments.

2. Almost all the witnesses were recent acquaintances, none of them possessing the power to compare him, in his decrepitude, with what he had been, when he unquestionably possessed the *mens sana in corpore sano*.

3. The most of them were physicians, yet they do not seem to have been experts in the science of insanity, or to have ever directed their attention particularly to that subject. I have had repeated occasion to declare the slight regard I have for such testimony. My views were fully expressed in *Kleim's case*. I need not repeat them here, but I will add that a case recently before me has gone still further to demonstrate to me their soundness. So far as these physicians ap-

pear from the testimony to be men of education, of intelligence, and of good sense, their opinions are of value, and no farther.

4. Mr. White, who drew the will, never knew him until that day. Dr. Hooker, a witness to the will, had known him about three months, and during that time had seen him only occasionally. Drs. Ives and Knight could form no opinion. Dr. Beers arrived at his conclusion after only two interviews. Dr. Hotchkiss never knew him until the execution of the will. Mr. Ellis saw him occasionally only. Mr. Clark had only two interviews. Mr. Galpin two or three. Mr. Treat only occasionally, never intimately; and Judge Daggett, who drew the will, only one. Dr. Knight, who was the family physician, saw him when he was deranged, in 1841, and did not see him again until the proceedings to restore him, in December, 1842, and then he saw him twice.

5. Very many of the interviews were after the will was drawn, after its contents were known to those who had charge of him, and who seem to have had, and to have exercised, entire control as to the persons who should visit him, and the occasions on which they should be allowed to do so.

I have thus run rapidly over the evidence in support of the will, and the considerations growing out of it, in order to test the degree of weight to which it may justly be entitled at my hands.

I now turn to the other side of the picture.

II. Evidence against its validity: —

1. And the first thing that strikes me is the unbounded influence that Hammond and family — including in that term the three daughters in New Haven — had over the testator and all his motions, realizing, to the last moment of his life, the testimony given by Hammond before the commissioners here — that he was — by them, at least — as easily controlled as a child. Whether any of his children or friends should see him, or not, seems to have depended on their pleasure, not on his, and it was only when they had a desire to have him sane, that he made an effort to be declared so.

· In the matter of Benjamin Taylor's will.

2. The next thought that occurs is, that he regarded his son Charles, his daughter, Mrs. Timpson, and Mr. Eastmond, as his enemies. He had taken great pains, and apparently much pride, in Charles. He had taken him to Europe with him, and had given him a good education. Mrs. Timpson was his daughter by the first wife, and Mr. Eastmond had for twenty years been his friend, and managed his property for him. What was there to cause him to think them his enemies? Was that the hallucination of an unsound mind, and was it the impression produced by others upon one who could be as easily controlled as a child?

3. All the witnesses unite in describing him as a very infirm, feeble old man of fourscore, and upward, evincing day by day the abstraction and imbecility of intellect that accompanies extreme old age. The fire of his intellect had not quite given out, but the embers that were left told rather of the flame that had been, and of the ashes that soon would be, and if they ever sparkled up into a fitful light, they only served to show more plainly the scattered fragments of broken thought which lay strewn around.

4. Whether in such condition he was of sound disposing mind and memory, the terms of the will, themselves, aid in determining. His oldest child by the appellant was born in May, 1805, and from that time until 1843, a period of near forty years, not a doubt was expressed as to his being lawfully married. From that time — viz., 1805 — for over ten years, they lived together as man and wife, she bore him four other children — she took care of and brought up his four children by his first wife, the eldest of whom was only six years old when her first child was born. During the ensuing ten years, when he was abroad, she lived in his house, was supported by his means, kept his family together until two of his first class of children were married at her house. He recorded the births of both stocks, side by side, in the same family Bible; educated all in the same manner, and by the same name, and then, by a few cold words in his will, branded her as his concubine, her who for forty years he had allowed to possess the name, rank

and privileges, and to discharge the duties of a lawful wife, and stamped the children, whom he had thus so carefully nurtured for a quarter of a century, with the stain of illegitimacy.

Was all this natural? Did it spring from the unbiassed judgment of a sound understanding? It may have done so, but if it did, it is not a little remarkable that no inkling of this thought should ever have been discovered until he had got into the custody and under the control of those who were most strongly interested in working that thought into a reality.

5. The insanity with which he was confessedly afflicted in 1841, seems to have been the result of disease working upon an aged and worn out frame. By his daughter Catherine it is described as imbecility — he was unable to take care of, to dress or to feed himself; and by Hammond he is said to have been more simple than otherwise — easily controlled, a breaking up of his mental faculties. After this, some of the witnesses speak of him as sitting listlessly in the doorway, indifferent to the objects around him. In April, 1843, he had forgotten his old friend and agent, Eastmond. In May he did not recognize the grandchild of whom he had once been fond, and on his return from New York the hack driver described him as extremely feeble, as talking to himself, and indifferent to those common matters which interest all other people. This is senility, and it is extremely improbable, with his bodily infirmities growing upon him, out of which his mental incapacity had grown, that his mind should have been restored. All else was falling to ruin, and what was there left on which his mind could reconstruct its soundness?

6. From February, 1841, to December, 1842, he was treated by the family at New Haven as insane. He died in January, 1845, prior to which, as Mr. Hammond informed Dr. Hooker, he had been for a month or two occasionally deranged, and he died deranged. So, that during that period of four years, for more than half the time he was regarded as unsound, and during the residue of the time he was kept very much

In the matter of Benjamin Taylor's will.

secluded, his other children not allowed to see him, and others denied to him by Mrs. H., because, as she said, he was very crazy, and it would make him worse to see any one.

7. Under these circumstances, and he having twice been declared insane by competent tribunals, the presumption is that his insanity continued. The burden of proof is upon those who seek to establish his sanity, and if they fail to do that, or if they leave a rational doubt on the subject, the decree must be against the validity of the will.

I do not see how any one can read the testimony in this case and not entertain doubts as to the testator's sanity. Aside from the considerations already presented, the evidence of those who had known the testator in his sound days is very clear as to his condition about the time of making this will. Mr. Eastmond, and his granddaughter, are the only two who seem to have been allowed the opportunity of seeing him — the former only after much importunity, and then only in the presence of his daughters, and the latter only by accident as she met him in the street. Both these persons had the power of comparing his condition with what it had been when he was unquestionably sane, and both are clear and decided in their opinion, and explicit in the relation of facts which warrant that opinion.

When to this is added the strong argument growing out of the manner in which they who assert this will themselves treated the testator, as one incapable of governing himself, the conclusion becomes irresistible to my mind that he was not of sound and disposing mind.

The decree of the surrogate must therefore be reversed.