We have carefully read over the charge of the court, and think it was as favorable to the defendant as the facts justified. Some phrases, taken alone, might be criticised, but we must remember that the charge was relating to this specific publication, which was libelous per se. So, when the court speaks of the inference of malice, and that the said inference is irrebuttable, it is alluding to this particular libel charged, and the meaning evidently was that, in such a publication, the jury were bound to infer malice, so as to entitle the plaintiff to a verdict for at least nominal damages, and that was undoubtedly correct.

The refusal of the court to charge several of the requests proposed by the defendant was based upon the fact that the substance had already been covered by the charge as delivered. As to the exception taken to the word "retribution," in the charge, as relating to the amount of damages that the plaintiff is entitled to as compensation for the wrong, the context shows that that word was used, not in relation to punishment, but to the fixing by the jury of such a sum of money as will furnish the plaintiff a fair and just compensation for the wrong. Taking the charge as a whole, we think it as favorable to the defendant as the case would justify, and that the defendant has no ground for complaint. The exceptions taken to the evidence seem to be immaterial. The judgment should therefore be affirmed, with costs. All concur.

---

(90 Hun, 238.)

### CHENEY v. PRICE et al.

(Supreme Court, General Term, Fifth Department. October 16, 1895.)

WILLS—ACTION TO DETERMINE VALIDITY—EVIDENCE.

> In an action to determine the validity of a will, it appeared that testator, about December 15th, was stricken with apoplexy, resulting in partial paralysis, and died April 20th following. The will was made on February 1st before testator's death. Between the time of the attack of apoplexy and his death, testator's physical and mental condition was variable. At times he was able to express himself clearly, and at other times he was not. A few weeks before he executed the will, he transacted important business. On January 3d, pursuant to an intention of several years' standing, he offered to transfer to a nephew certain mortgages. About the same time, he inquired about the payment of dividends on certain bank stock owned by him, saying that he had not received his dividend; when, as a matter of fact, it had been credited on his book, but had not been noticed by him. While preparing his will, he consulted with his nephew, with whom he was living, and with his counsel, as to the propriety of bequeathing $4,000 to a hospital, and finally concluded to make the bequest. The residue of his estate, amounting to about $23,000, he left to his next of kin. *Held*, that testator showed sufficient capacity to make a will, though various witnesses testified that his conduct between the time of the attack of apoplexy and his death was queer, that he had a strange look in his eyes, etc.

Appeal from circuit court.

Action by Asa Cheney against Oscar F. Price and others. From a judgment entered on a verdict in favor of defendants, plaintiff appeals. Affirmed.

The opinion of Mr. Justice LAMBERT at circuit is as follows:

"Spencer Cheney executed a paper writing February 1, 1892, as his last will and testament, and thereafter died on the 20th of April of the same year, by the terms of which he gave to the defendant association $4,000, and the balance of his estate was left to be governed by the laws of descent and distribution. The estate consisted of $20,000 personalty and $7,000 in realty. The plaintiff and the defendants Cheney were the brothers and only heirs at law and next of kin of the deceased. The instrument was offered for probate in the surrogate's court, and the heirs at law filed objections to its probate, on the ground of incapacity and undue influence. Such proceedings were had that thereafter, and on the 30th of November, 1892, the instrument was admitted to probate in the surrogate's court of Chautauqua county as a will of real and personal property. In December following, this action was brought, under the authority of chapter 591 of the Laws of 1892. By this statute the issue is limited to the question whether the writing produced is or is not the last will of the testator. While this statute defines and limits the inquiry in the action, it was not intended to change the conditions under which a person is permitted to make a testamentary disposition of property by the Revised Statutes, providing that all persons, except idiots, persons of unsound mind, and infants, may devise real estate, and males upwards of eighteen years may bequeath personal estate (2 Rev. St. pp. 56, 60), so that, notwithstanding the provisions of chapter 591 of the Laws of 1892, under which the action is brought, the range of inquiry, measure of capacity, and freedom of action, as defined by the Revised Statutes and interpreted by the courts, is to prevail in reaching a determination of the issues made in this action. There is no claim made, nor could there well be under the proof taken, that the deceased, at the time of the execution of the instrument in question, or at any other period in his lifetime, was suffering from the infirmities of idiocy, so that the issue is narrowed to the question whether the testator, at the time of the execution of the will in question, was a person of sound mind, and was acting free from restraint and undue influence. Within the meaning of the term 'unsoundness of mind,' as mentioned in the statutes, the various phases of mental conditions, as defined by the terms 'insanity,' 'mental derangement,' 'unsoundness,' and 'monomania,' are held by the courts to be within the range of inquiry in determining whether or not a person at the time of executing an alleged will was a person of 'unsound mind.' These terms are of such variable significance that their value in any given case will depend entirely upon the relation that they bear to the particular person, in connection with the particular act under inquiry. They simply represent or describe a sliding scale of mental disorder or enfeeblement, expressing different degrees of determination or its absence, mental ability or its absence. The precise line where disability or incapacity commences cannot be defined by the courts by an unvarying rule, and for that reason each case is tested in the light of general rules by the proof and circumstances attending it. From the multiplicity of decisions in this state upon this subject that have gone into the Reports, one general rule seems to have been so formulated in a decision of the court of appeals as to have met with favor by the courts pronouncing judgment in cases of this character. That definition of the law is as definite as the subject will admit of, and it seems to have been adopted by counsel on either side of this controversy as the basis upon which their conclusions rest in the disposition of this case. In Van Guysling v. Van Kuren, 35 N. Y. 70, Smith, J., speaking for the court, used this language: 'He must, in the language of the cases, have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive, at least, their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things is, within the meaning and intent of the statute of wills, a person of sound mind and memory, and is competent to dispose of his estate by will.'

"With this rule in mind, we come to the question whether or not the writing produced is or is not the last will of the testator; and the solution of that question depends on whether the testator was of sound and disposing mind and

memory at the time of the execution of the instrument, and whether the will itself is the free and uninfluenced act of the testator. The deceased was about sixty-eight years of age, had lived in the township in which he died nearly all his life, and had never married. A short time before the 15th day of December, 1891, he had a fit of apoplexy, which finally resulted in partial paralysis. He had been all his life an active, intelligent, and industrious man, giving personal attention to the details of his business, which consisted in running a farm, loaning money upon securities, making investments, and collecting interest accruing from the same; was reticent respecting his business affairs to a remarkable degree; was a person of determined will, and positive in his opinions; on friendly terms with his relatives, consisting of his three brothers and their families, although they knew little about the details or nature of his business transactions; was a genial and social person with those of his acquaintance, but, having occupied rooms alone, had contracted the habit of reticence respecting his business affairs. His affliction, which occurred shortly before the 15th day of December, 1891, was first manifested by substantial unconsciousness, and later by inability to articulate so that he could not be understood without great difficulty, and had a changed expression and inability to move about. The evidence discloses that he rallied to a certain extent within a few days after the attack, and that the disturbance of the vocal organs was less perceptible at periods up to within a short time before his death, which occurred on the 20th of April, 1892. It is fairly to be inferred, giving credit to the evidence of each and every of the witnesses who testified upon the trial, that on some days he could converse with greater ease and facility than on others. It is equally clear, from the undisputed evidence in the case, that after the deceased suffered this affliction in December he did not give the attention to the transaction of his business that had been his habit before; that in conversation with others he did not evince the interest in social affairs that he previously had; did not attempt to lead in conversation, or introduce any subject as a topic of conversation with those with whom he came in contact. There was a noticeable and pronounced change in his life, so far as the same could be evidenced by his manifestations towards others and himself. Nearly all of the witnesses, including the doctor in attendance during his sickness, advanced the opinion, based upon the circumstances attending interviews had with the deceased, and his manifestations, that his conduct, acts, and sayings impressed them as irrational. The doctor in attendance advanced the general opinion, from observance made at various times during his attendance upon the testator, that he was a person of unsound mind, and was incompetent to transact any business requiring consideration and judgment. Upon the established existence of the facts narrated, the plaintiff contends that the paper writing produced is not the will of the deceased, for the reason that at the time he executed it he was not of sound and disposing mind and memory. The material inquiry is not the mental condition of the deceased on any of the days succeeding his affliction, except for the purpose of determining what his condition was on the 1st day of February, 1892, when he executed the instrument produced as his last will and testament; so that if the evidence fairly discloses that, notwithstanding he had undergone this marked mental and physical change, as described by the witnesses, at the time of the execution of the paper writing, the deceased had sufficient force and integrity of mind to deliberate upon the subject of the disposition of his property, having regard to its nature and amount, the relatives who might or should be the objects of his bounty, and form a rational judgment thereon without prompting, then the question directed by the statute to be inquired into should be answered in the affirmative. It is not essential to the validity of his act that he be possessed of the vigor and resolution of mind and body that he possessed in prime of life, but simply that he had sufficient memory and judgment upon the occasion of making the instrument to make it his deliberate and intelligent act. The attesting witnesses each testify that, at the time of the execution of the instrument, the deceased signed the same after it had been read over to him, and declared it to be his last will and testament; and they also testify, especially the draughtsman, that they had no trouble in conversing with or understanding the directions given by the deceased. This is the particular time under inquiry. The witnesses to the

will are the only ones who speak particularly with reference to the condition of the deceased upon this occasion; and if their evidence is fairly sustained from the circumstances and probabilities, then the plaintiff must fail. Upon one side we have the evidence of the subscribing witnesses, supported as they may be by the probabilities to which the circumstances give rise; upon the other, the evidence of Dr. Lenhart, who testifies that when he was called to attend the deceased on the 15th day of December, 1891, he found him, as before stated, in an unconscious condition, wholly unable to recognize any one or appreciate his surroundings, and that, while thereafter he rallied to a certain extent, at no time during his sickness was he able to converse intelligently upon any subject, and at times seemed better than at others; that his first visit was on the 15th of December, and the last on the 14th of March following. It is also disclosed in his examination that he did not see the deceased between the 14th of January and the 17th of February, so that his evidence is not of great value in disposing of this case, except so far as the contention of the plaintiff is sustained by the opinion of the doctor as a medical expert when he testifies that the deceased was suffering from a disease of the brain, and that, therefore, the conclusion should be drawn that at no time after his affliction was he competent to transact any business. The probative force to be given to this opinion is lessened to a considerable extent by the statement of the doctor that on some days the deceased was better able to express himself than on others,—so that it can hardly be said that the evidence of the doctor, although much relied upon by the plaintiff to sustain his allegation, is entitled to a conclusive inference. In reaching this conclusion, we are not unmindful of the long acquaintance between the doctor and the deceased, taken in connection with the trained skill of the witness to determine the mental status of the testator at the time and times of which he speaks; yet the conclusion is forced, in the light of the other evidence in the case, and of the probabilities, that the doctor may have been misled as to the continuing condition of his patient.

"The evidence of Dr. Hall relates to a period of time upwards of two months after the execution of the will, and to a time when it must be conceded that the deceased was nearing the period of dissolution, and therefore his evidence must be regarded as of slight importance as proof bearing upon the substantial issue in the case.

"The evidence of the witness Mark Cheney is entitled to greater consideration, as evidencing the mental and physical condition of the deceased, as he relates conversations, and describes the conduct and acts of the deceased, at short intervals during his entire sickness. He testifies that on December 18th he called, and found the deceased figuring on a statement from the cheese factory, and that the deceased informed him that he was unable to make it out. He next saw him on the 24th of the month, when he states that the deceased had rallied some, so much so that he could distinguish some of the words he tried to utter. That he talked with him about his medicine, and that deceased told him it was doing him no good, that his bowels did not move, and that the victuals he ate did him no good. That thereafter he saw him once or twice a week, and would generally ask him how he was, and that sometimes he would answer and sometimes he would not. That during all this period he noticed there was a difficulty in his speech, to articulate words or to connect sentences, and that the expression of his face had changed; that there was a wild and staring look from his eye and a restlessness, moving in his chair or in his bed, changing positions often, and that he had a sour and melancholy look on his face. These were the observations that the witness made during the entire period ensuing after the 18th of December until the time of his death. Again, he refers to the occurrence that took place on the 21st of February, when he took charge of the deceased during the day. He relates that as he approached the house the deceased was at the door, and said, 'You are the boy I am looking after; I came pretty near dying yesterday. There was not a soul in the house. My breath gave out, or I got short of breath, and I hung a flag out of the door.' Later he said he had no circulation in his left arm, nor in his side. All of these statements might be true. Certainly, from the statements of Dr. Lenhart it would appear that the deceased was quite rational upon the subject of the failure of circulation in the left

arm and side, as it was stated by the doctor that it was the left side of the deceased that was involved by the stroke of paralysis. Later in the day the deceased said, in answer to the inquiry if they did not cook anything for him: 'Yes, but a hog wouldn't eat it   'He told me he thought my brother and the doctor were laying a plan to poison him or get him out of the way.' That was the last conversation that the witness ever had with him. These last statements by the deceased would indicate a deranged condition of the mind at that time, and that might be true and he yet have been entirely free from it at the time of the execution of the will, twenty days previous thereto. The witness, however, states that upon his second visit he found that the deceased had rallied from the condition in which he was in upon his first call, and that it was evidenced by his ability to articulate so that in a measure he could be understood. It will be observed that the occurrences related by the witness, so far as they are found in the expressed declarations of the deceased from which he was impressed that they were irrational, in no manner related to the subject of his property or his relatives, and therefore it cannot be said that they necessarily influenced the deceased to select a legatee to the exclusion of his relatives. The importance to be attached to the evidence of this witness relates wholly to the changed condition of mind of the deceased, and to show its degeneracy and decay as bearing upon his testamentary capacity.

"The evidence of A. Morrell Cheney may be referred to for the purpose of determining the strength of mind of the testator at two given periods before the execution of the will. He states that he called upon the deceased December 14th; that he had very little conversation with him, and that he called again on January 3d, and found him sitting in a rocking chair, with his usual clothes on, except his coat, and the witness said: 'I asked him if he sent for me, and he said he did. I told him that was the reason I come up, and then he says, "I didn't know but you wanted those papers." I says, "What papers?" He says, "Those assignments," and went into his room, his bedroom, and come out with a bundle of papers, and said he had got them sorted out; if I wanted them, I had better take them; and began to open them up, some of them, and says, "Here is this large mortgage, and this small mortgage, and some is paid on it." He said he didn't know how much was paid on another one. * * * He took a pencil out of his pocket, and dated one of them, at the bottom, January 3d, 1892. * * * He made quite a bad-looking date of it. Then he handed his pencil to me, and says, "You date the rest of these," and he sorted them out, and handed them to me, and I did write "January 3d" on as many as he asked me to.' From a subsequent examination of this witness, it is disclosed that the assignments referred to were of mortgages, to the amount of about $5,000, and that these assignments were prepared, all but one, in 1889, at a time when it is conceded that the deceased was in the full possession of his mental capacity. The inference, therefore, is quite clear that the deceased had contemplated the transfer of these mortgages to the witness for quite a long period of time, and that at this time, with a view of carrying out the purpose previously formed, he sent for the witness and made a tender of the gift. This transaction, rather than indicating incompetency to deliberate and execute a judgment formed before his sickness, tends to show that there was still left that degree of intelligent thought and purpose of mind to enable him to make a disposition of his property. The witness then related that the deceased asked if he had received a dividend from his bank stock, and when he told him he had, then stated that he (the deceased) had not received his dividend. When an examination of the credits upon his pass book disclosed that he had received the said dividend, he then stated that he did not know it. While this evidence discloses that the deceased was not as accurate and acute as he had been when in health, it does not necessarily disclose that he was bereft of all reason and memory. The contrary appears. He remembered the fact that they owned stock in the same bank, and that the time had passed for dividends to be declared, and the fact that he did not observe the credit upon his bank book was only such an error as might have been made by a less accurate man when in full health. Again, witness states that on January 12th he called for the purpose of obtaining the proxy of the deceased to vote his bank stock at the election of officers, and that the deceased signed his name without question to the blank prepared. This con-

duct upon the part of the deceased was within the range of reasonable prudence, when viewed in the light of the circumstances existing. The witness was his nephew, and was held in such high regard and confidence that only nine days previous he tendered him a gift of $5,000 in execution of a design formed nearly three years before.

"Miss Arnold testified that she saw the deceased before Christmas, and then again about the 1st of March, and that he talked better than when she first saw him; that he answered all her questions; that she stated to him that Morris Cheney's wife was sick, and that she came down to see her, and that the deceased asked her what she thought of the condition of Morris Cheney's wife. The evidence of this witness certainly indicates intelligent and reflective thought upon the part of the deceased, and she stated that the appearance, conversation, and conduct of the deceased upon that occasion impressed her as rational.

"The witness Morris Cheney testifies that he called upon the deceased on the 11th or 12th of December, and found him in a low condition; that he was nervous and excited, and had a wild look in his eyes, and that he, the witness, could understand very little of what he said, on account of the difficulty with his throat or his tongue; that deceased would start to tell something, and would say, 'I can't say what I want to.' Again, on the 13th or 14th, the witness testifies that he found him in the same condition, and presented a check for work done, and the deceased said that the witness would have to sign his name, as he could not, and that he gave him three checks to pay his taxes with, without asking the amount of the taxes. There seems to be nothing in the evidence of this witness, so far, that would indicate anything more than the impairment of his physical powers; that in these transactions the deceased responded intelligently, so far as his acts demonstrated his thinking capacity, while undoubtedly, as the witness states, he had difficulty in giving expression to his thoughts, in consequence of the paralysis to his left side, from which it was found that he was suffering. It also appears that on the 24th of December the witness took the deceased to his own home, where he continued to reside up to the time of his death. The witness was asked to describe the condition of the deceased down until March, and he answered, 'Well, sometimes he couldn't talk very plain. He would start out to tell something, and ask something, and his tongue or something would not work, and then he would forget before he could get to talking again; say he had forgotten; he couldn't tell what he wanted to.' Again: 'There were times he could talk plainer than he could at others. Sometimes he was very nervous; then he couldn't talk hardly any. * * * It appeared to flurry him.' The witness further said: 'I can't make any more than one description that covers all the time. He had a wild look. He never laughed or smiled while he lived with me. He was very solemn and melancholy about his talk.' The fair consideration of the evidence of this witness discloses that the deceased had changed in demeanor, mentally and physically. That certainly must have been the consequence following his affliction; but it is to be observed from the evidence of this witness, as well as from that of the others, that at times the deceased could talk more readily than others, and an analysis of his testimony shows that whatever the deceased did say was intelligent upon the subject upon which he was addressed, and therefore the inference is permissible that his affliction did not operate so much upon his mental faculties as the muscles connected with the organs of speech.

"The same observation may be addressed to the evidence of the remaining witnesses who were sworn for the plaintiff, upon this same general subject; and, aside from the incident related by the witness Mark Cheney, of the plot that the deceased conceived was set on foot by the doctor and Morris to poison him, and the fact that he insisted that he had no stomach, there is no evidence to show that the deceased at any time was laboring under an alienation of mind, to the extent even of a delusion. The evidence discloses that the deceased by some means sent for the draughtsman of the will to come and see him. This selection indicates judgment, from the fact that Mr. Wicks had been his counsel for a considerable period of time. After the execution of the first will, which occurred on the 29th of January, the deceased, after consultation with Morris Cheney, in whose care he then was, evidenced a

previously formed judgment to either destroy it or make some change in the disposition of his property, by a written communication for him to return with the will that he had previously executed. Upon the return, on the evening of the 1st or the morning of the 2d of February, the deceased directed the destruction of the will he had made, and, after consultation with his counsel respecting the defendant association, which he had made a beneficiary to the amount of $4,000, he reasserted his intention to make the association his beneficiary in the same amount as in the previous will. And while the draughtsman was in an adjacent room, preparing the will for execution, Morris Cheney testifies the deceased called him into his room for advice respecting the gift of $4,000 to the defendant association. The witness said: 'He asked me what he better do about giving the hospital that four thousand dollars, and I reminded him of the previous talk we had had Sunday, the day before. He said Mr. Wicks didn't want him to change it; that the four thousand dollars would just take them out of debt. He said he believed he would let it go just as it was; that four thousand dollars was not a very big pile.' This evidence is important, for a two-fold reason: (1) It indicates that the testator was able to give expression to his thoughts with a readiness and facility of language that could scarcely be attributed to a person without the ability of expression; and (2) it indicates, not only a comprehension of the business at hand, but that it was made the subject of deliberate thought and reflection by the deceased. It also indicates that the deceased did not rely upon the suggestion or expressed wish of Mr. Wicks, because he called upon his nephew, with whom he was living, for his advice upon the subject of this gift; and, for the purpose of emphasizing the individual judgment and purpose of the deceased to make the gift, we find that he failed to pay deference even to the opinion of the witness for whose advice he called. Excepting the evidence of the attesting witnesses and of Morris Cheney, no person speaks upon the condition of mind as manifested by the deceased upon the occasion of the execution of the instrument in question; and, so far as concerns the question of the ability of the deceased to consider the amount and character of his estate, and the person or persons who might have a claim to his bounty, and to hold them in his mind a sufficient length of time to perceive, at least, their obvious relation to each other, and to be able to form some rational judgment in respect thereto, it cannot be doubted from their evidence that he possessed such ability. This conclusion is further unmistakably evidenced by the letter written on the next succeeding day to Mr. Wicks, in whose custody he placed the will for safe-keeping, to destroy it. The letter is in the handwriting of the deceased, and is so explicit, and yet so comprehensive, that it can leave no doubt but that the testator fully appreciated the act he had performed in the execution of the will on the previous day, and the results that would follow in case it was allowed to remain undestroyed. While the ineffectual attempt to destroy the second will, as well as the first, so soon after their execution, indicates a failing and vacillating mind, it cannot be regarded as conclusive that the testator did not have testamentary capacity, when considered in the light of the evidence given of the occurrences attending the execution of the instrument, and the declarations of the testator subsequently made respecting it. At most, it is but a circumstance proper to be taken into account as bearing upon the mental condition of the deceased, and, in and of itself, and in connection with the evidence given relating to the mental and physical condition of the deceased during his last sickness, does not meet the force of the evidence given to the effect that the testator comprehended the legal effect of the execution of the paper offered as his last will.

"It has been suggested that the deceased had no knowledge of the defendant association, nor its object, or relations with the parties under whose management its affairs were conducted, and that therefore it is improbable that the testator selected the association as the object of his bounty to the exclusion of his blood relatives. There is little force in this position. The testator, but a short time before the execution of the instrument in question, sought to carry out a gift of $5,000 worth of securities to A. Morrell Cheney, in execution of a contemplated purpose that had existed for upwards of two years, thereby intending to exclude his three brothers from the enjoyment of that portion of his estate,—so that it is but natural to infer that, inas-

much as the attempt to divert that portion of his estate from his brothers was frustrated by the refusal of the donee to accept the gift, the testator should look elsewhere for a worthy object. The evidence discloses that he was an intelligent man, and interested in social and public affairs, and, having evinced a desire to make a disposition of about $5,000 in hostility to the claims that the law would give to his brothers upon his property, it is but fair to presume that he selected the defendant association as a medium through which he could accomplish a worthy object.

"The validity of the will in question is assailed in the complaint upon the charge of undue influence; but in the submission of the case there was no claim made that the charge had been sustained upon the proof, nor could it well be made, as proof of the fact is not presented by the evidence. The contrary is demonstrated, from the evidence of the witness Morris Cheney, when he states that, while the will was being prepared, the deceased sought an expression of his judgment upon the propriety of making the defendant society his donee to the extent of $4,000, and, after receiving the same, declined to act upon it in preference to his own judgment. This clearly demonstrates that whatever suggestion or importunity Mr. Wicks may have introduced in behalf of the society was held in abeyance by the deceased until after the interview with Morris, and then it is disclosed that he concluded to make the bequest in accordance with the instructions for the preparation of the will. These circumstances refute all inferences of restraint. After carefully considering the evidence in this case, the circumstances, and probabilities, the conclusion is forced that the instrument in question should be declared by the judgment of this court to be the will of the testator. A bill of costs is allowed to the plaintiff and the defendants, to be paid out of the estate."

Argued before LEWIS, BRADLEY, WARD, and DAVY, JJ.

Bootey, Fowler & Weeks, for appellant.

Eleazer Green and Frank W. Stevens, for respondents.

PER CURIAM. Judgment affirmed, with costs, on opinion of LAMBERT, J., at circuit.

(85 Hun, 616.)

### COOKE v. CHASE.

(Supreme Court, General Term, Fourth Department. February, 1895.)

1. CREDITORS' BILL—PLEADING.
    The complaint in an action to set aside a transfer of property by a decedent alleged that said decedent died insolvent; that, before his death, he transferred most of his property to defendant, with intent to defraud his creditors; that, by his will, defendant was appointed his executrix; that she qualified and is now acting as such; that she claims the property so transferred to her as her own; that decedent left no other property with which to pay his debts,—and asked that such transfer be adjudged fraudulent and void, and that the property be applied in payment of all creditors of the decedent. Held, that the averments of the complaint were sufficient to bring the case within Laws 1889, c. 487, which provides that a creditor of a deceased insolvent debtor may, for the benefit of himself and other creditors, maintain an action to set aside any transfer made by said deceased debtor in fraud of his creditors, and that he need not first obtain judgment on his claim.

2. SAME—JOINDER OF CAUSES OF ACTION.
    Such complaint does not join two causes of action, in that defendant is sued both individually and as administratrix of decedent.

Appeal from special term.

Action by David B. Cooke against Lizzie M. Chase, personally and as administratrix of Horace B. Stetson, deceased, to set aside a trans-