### MILLER v. MILLER et al.

(Supreme Court, Appellate Division, First Department. May 31, 1912.)

WILLS (§§ 166, 55*)—PROBATE—EVIDENCE—WEIGHT AND SUFFICIENCY.

　　Evidence, in an action under Code Civ. Proc. § 2653a, to revoke the probate of a will, *held* insufficient to support the jury's findings of testamentary incapacity and undue influence.

　　[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437, 137–161; Dec. Dig. §§ 166, 55.*]

Appeal from Trial Term, New York County.

Action by Mary Ella Miller against Gordon D. Miller and others. From a judgment on a verdict for plaintiff and an order denying a new trial, defendants appeal. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

L. E. Warren, of New York City, for appellants.
Herbert C. Smyth, of New York City (Roderic Wellman, of New York City, on the brief), for respondent.

LAUGHLIN, J. This is an action under section 2653a of the Code of Civil Procedure to revoke the probate of the will of Alexander Miller, who died on the 6th day of May, 1909. A petition for the probate of the will was duly presented to the Surrogate's Court of the county of New York on the 13th day of May, 1909. Objections to its probate were filed by the plaintiff, who is the widow of the decedent; but they were subsequently withdrawn, and the will was duly admitted to probate on the 23d day of June, 1909. This action was commenced on the 24th day of February thereafter, to have the will declared null and void, and the probate thereof vacated on three grounds, namely: (1) That the decedent did not sign it, or publish or execute it, as required by law; (2) that he was of unsound mind and incapable of making a testamentary disposition of his property; and (3) that, if he executed the will, its execution was procured by fraud and undue influence. Upon the trial, after the introduction of expert testimony tending to show that the signature to the will was not in the handwriting of the decedent, that contention was aban-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

doned, and the only questions submitted to the jury were whether the decedent was competent to make a will, and whether he was unduly influenced. The jury answered both questions in favor of the plaintiff.

The learned counsel for the respondent contends that, in view of these special findings on the separate issues, the judgment must be permitted to stand if there was sufficient evidence to sustain it upon either theory, which doubtless ordinarily is the rule; but we are of opinion that the verdict is clearly against the preponderance of the evidence upon both issues.

It is claimed at the outset that the will is unnatural; but even that is not satisfactorily shown. The age of the decedent is not definitely shown. The evidence tends to show that he was between 52 and 59 years of age at the time of his death. He married the plaintiff on the 23d day of November 1898, and had never been married before. Prior to his marriage, his three maiden sisters and his brother Gordon lived with him. The decedent was the head of the family, and furnished the principal support. His business had always been that of a boiler maker, and it had been conducted by a copartnership, of which he was a member, in the name of Brown & Miller until the month of September, 1902, when he bought out Brown's interest for $60,000 and took his brother Gordon into partnership with him, giving him an undivided one-half interest, and thereafter until the death of the decedent the business was conducted in the name of Alex. Miller & Bro. By the will, he gave the plaintiff $12,500 in lieu of dower, and he left the remainder of his property to his brother Gordon and his three sisters in equal shares. It does not appear that he owned any real estate in his individual right. The plant, which was at Jersey City, N. J., belonged to the copartnership. The evidence does not show with any degree of definiteness the value of the property he owned *at the time he made the will.* The business was successful, and the profits for that year were nearly $40,000. In giving his attorney the data for drawing the will, and stating the amount that he wished to leave to his wife, he said, according to the testimony of the attorney, that he had given her a great deal of money, and that $12,500 was about the right amount, according to his circumstances. It appears that he paid $4,000 of the purchase price of the premises No. 257 West Ninety-Seventh street, which was deeded to her and which they occupied as a residence, and there is evidence tending to show that he gave her furniture of considerable value. He stated some years after the execution of the will that he was worth half a million dollars, and that for a period commencing about 1902 the firm profits were from $80,000 to $100,000 a year. and he and Gordon agreed in 1908 that the business was then worth $300,000; but the court expressly ruled, on receiving this evidence, that it was not admitted to show the value of the decedent's property.

The decedent appears to have been very fond of the plaintiff, and with the exception of an occasion when he expelled her from the house in the evening, stating in substance that he wished to get rid of her and that he was advised by his brother to take that course, which was

doubtless influenced by drink, the evidence tends to show that he was at all times affectionate toward her. They had, however, married late in life, and a child born to them the year following their marriage died soon after. They had no issue living, and evidently he did not expect, at the time the will was made, that there would be issue of the marriage, and there was none. He was also devoted to his brother Gordon and his sisters. The sisters were opposed to his marriage, and they manifested unfriendliness toward the plaintiff. Shortly after the marriage, the relations between the plaintiff and her husband's sisters terminated; but thereafter the decedent openly and alone visited his sisters and brother Gordon regularly from two to three evenings a week, and he continued to support, or contribute largely to the support of, his sisters. He held his brother Gordon in high esteem, and from time to time directed the bookkeeper to charge moneys, drawn from the firm by Gordon, to his own individual account. The amount left to the widow, therefore, has not been clearly shown to be so out of proportion to the value of his estate as in the circumstances to indicate either undue influence or incompetency, and that argument is without force.

The firm of Alexander & Ash were the attorneys for the decedent's father, and represented the defendants in settling his estate, and were the attorneys for the decedent's firms, and did considerable business for them. The decedent usually transacted the business of his firms with the attorneys, and they came to know him intimately. The uncontroverted evidence is that the will was executed in the office of Alexander & Ash on the 28th day of July, 1904, and that the decedent then and there produced a checkbook and filled out the stub and wrote a check for $25, and delivered it to Mr. Ash; that being the charge for drawing the will. According to the testimony of Mr. Ash, who appears to be wholly disinterested, the decedent called at the office about a week prior to this time to have his will drawn, and stated how he wished to leave his property, and that at that time, and when the will was executed, the decedent appeared to be in full possession of his faculties and in good health and vigor, physically and mentally. Mr. Ash was one of the witnesses to the will, and the other was his managing clerk, who died before the trial. Mr. Alexander, who transacted admiralty business for the decedent and saw him quite frequently before and after the date of the will, likewise gave evidence tending to sustain his competency. About the year 1902 the decedent developed symptoms of Bright's disease and arteriosclerosis, and these diseases continued, became chronic, and they alone or together with alcoholism were the causes of his death. He was not, however, incapacitated from attending to business until about two months before he died, and down to that time he attended to the routine business of the firm practically to the same extent as before. He was quite familiar with the business of the firm and attended to its finances, to the making of contracts, to the engineering work, and supervised the business. He was regarded by those with whom he came in contact in a business way as exceptionably shrewd and competent down to the last. After

business hours he used intoxicating liquors, to some extent, almost habitually, and at times to excess.

He was a Scotchman, and he had been brought up in childhood in the Presbyterian religion, to which, however, he did not adhere in later life. He frequently expressed the belief that there was no hereafter, and that the Bible was not inspired, but was written by a good wise man. The plaintiff was of Irish descent and a Roman Catholic. They frequently discussed religion, and so far as appears, good naturedly, for he often spoke of her in this connection as being the smartest woman he ever knew. He, however, when under the influence of liquor, appears to have had an antipathy for religious pictures and emblems. Testimony was introduced tending to show that his memory gradually failed, and that shortly or remotely after having said things he would deny having said them. He was eccentric, and particularly with respect to his manners at the table. At times he manifested a malicious disposition, and when displeased with his landlord would injure the property of the landlord. He was at times destructive in the use of his own household fixtures and effects, and with respect to similar property of relatives whom he was visiting. This may have been due to temporary insanity caused by the diseases from which he was suffering and by excessive drinking, as indicated by the testimony of a medical expert; or it may well have been due to the stimulation of liquor and with a view to amusing those about him, which appears to have been the motive for many of his eccentric acts. Some of the testimony tends to show that he was a man of strong convictions and forcibly expressed his views; but other testimony tends to show that after discussions he usually yielded to the view of his brother Gordon. That evidence, however, is consistent with his having been convinced that he was wrong and Gordon was right. At times he was annoyed by the feeling on the part of his sisters towards his wife, and he was manifestly disturbed and became irritable over their jealousy concerning household furnishings and things purchased for his wife and their desire to have him purchase the same for them and over their quarreling among themselves and their constant intercessions with him for money. At times he left his wife affectionately to visit his brother and sisters and returned moody, depressed, and cross. Prior to the time the will was made, one of his sisters gave utterance to a statement to the effect that the plaintiff was not going to get all of the decedent's money away from them, meaning herself and her sisters, or herself, sisters, and brother. There is testimony to the effect that the decedent was afraid to be alone in the dark. The reason he assigned for this was that a house was not so likely to be burglarized if lighted. He at times fell asleep sitting up, and occasionally, during the last few years of his life, at the table when guests were present. On different occasions after eccentric conduct, he would doze off, and then awaken and cry, and on some occasions he would talk on awakening as if fearing that he was to be locked up in jail. The evening after he had the Ninty-Seventh street property conveyed to his wife, he asked her to sign it over to him, and stated that his brother Gordon said that he was foolish to allow

the title to be taken in her name and had advised this course; but she, having personally contributed $2,200 toward the purchase price, refused his request. Most of these peculiar acts and this unusual conduct on the part of the decedent were after the will was executed, and it increased to the end. It was shown that the decedent, after executing the will, repeatedly in the presence of the plaintiff, and at times when she was not present, denied that he had made a will, and asserted that he would not make one, and that it was unnecessary to make a will where a man left no children, and that in such case the law properly disposed of his property; and also that he had made provision for the plaintiff so that she could live as comfortably as they then lived and would have an interest in his business if she survived him. Upon this evidence it is claimed that he had forgotten he had made a will; but it appears that about a year before he died he called at his attorney's office, where he had left the will, and took it to his place of business and had it put in the safe. His declarations that he had made no will and had no intention of making one are quite consistent with his knowledge at the time that he had made a will, and may well have been induced by a desire to conceal the fact from his wife. On these and other similar acts, more trivial, however, recited in a hypothetical question, a medical expert expressed the opinion that decedent was incompetent and of unsound mind at the time of executing the will. But, on the other hand, an expert of at least equal experience and prominence testified that the facts recited in the hypothetical question were wholly inadequate to warrant an opinion upon the subject. We are convinced from an examination of the entire record, and particularly by the reliable uncontroverted evidence clearly showing that the decedent was at all times prior to and for several years subsequent to the time of making the will entirely competent to transact business intelligently, that he fully understood the nature and extent of his property and his obligations to his wife, and that he was of sound and disposing mind and memory at the time of the execution of the will.

The claim with respect to undue influence is that it was exercised upon the decedent by his brother Gordon and his three sisters. There is no express evidence that any influence was exercised, or attempted to be exercised, upon the decedent with respect to the execution of the will. The contention in that regard is based wholly on circumstantial evidence. The substance of this evidence is that already stated and other testimony tending to show that his sisters were jealous of the plaintiff, and were disposed to prevent her getting his property, and that he visited them frequently, which afforded them an opportunity to influence him; that he was subject to be mentally dominated, controlled, and directed by his brother Gordon; that Gordon accompanied the decedent when the will was made, which is based on the testimony of the plaintiff with respect to an interview with Mr. Ash, concerning which she testified that Ash admitted to her that Gordon acompanied the decedent to his office on the occasion when the will was drawn; and that the decedent did not intend, until it was suggested by the lawyer, to leave the plaintiff anything. But this is con-

troverted by Mr. Ash, who testified that on neither occasion did Gordon accompany the decedent to his office. The decedent and his wife had planned to take a trip to Bermuda the latter part of March, or fore part of April, 1909; but he was advised against going, first by Gordon, whose views rather determined him against the journey, and subsequently by his physician, and he let his wife go without him. He was taken sick the day after she sailed, and he went to his brother Gordon's, where he remained, attended by a trained nurse, nearly two weeks, and until the day before his wife returned, when he was brought home, and about a week thereafter he was taken to Atlanta, and after remaining there some two or three weeks he was brought home and died within a week. There is nothing to indicate that the decedent's sisters or brother induced him to go to their house while his wife was away, or that they attempted to detain him longer than he wished to stay. The opportunity on the part of his sisters and brother for influencing him was apparently much greater toward the last than when the will was made; but there is no evidence of any attempt to have the will changed.

On the issue with respect to undue influence, the evidence was wholly insufficient to take the case to the jury, and while it cannot be said that there was no evidence tending to show mental incapacity to make the will, the evidence to that effect was slight indeed, and entitled to very little weight, particularly the expression of opinion by a medical expert with respect to the decedent's mental condition at the time the will was drawn, based, for the most part, upon his subsequent acts and conduct, and the verdict in that respect is clearly against the weight and preponderance of the evidence.

It follows that the judgment and order should be reversed, and a new trial granted, with costs to appellants to abide the event. All concur.