### FAUDINGTON v. ERIE R. CO.

(Supreme Court, Appellate Division, Second Department.    March 4, 1910.)

MASTER AND SERVANT (§ 276*)—DEATH OF SERVANT—RAILROADS—DEFECTIVE TRACK—EVIDENCE.

In an action for the death of a railroad employé by the derailment of a tender, evidence *held* insufficient to warrant a finding that the derailment was caused by the flat wheel of the forward truck of the tender breaking a bolt connecting parts of a frog, whereby a wheel in the rear truck of the tender was derailed.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–952, 954, 959, 970, 976; Dec. Dig. § 276.*]

Appeal from Trial Term, Rockland County.

Action by Emma Faudington, as administratrix of the goods, chattels, and credits of James A. Faudington, deceased, against the Erie Railroad Company. From a judgment for plaintiff, and from an order

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

·denying defendant's motion for a new trial, he appeals.   Reversed, and new trial granted.

See, also, 127 App. Div. 928, 111 N. Y. Supp. 1118.

Argued before WOODWARD, JENKS, BURR, THOMAS, and RICH, JJ.

Henry Bacon, for appellant.

Frank Comesky, for respondent.

THOMAS, J.   Defendant's tender left the track and came in contact with a caboose on the adjoining track, killing therein the plaintiff's intestate, who was defendant's servant.   The negligence charged is, that the flat wheel of the forward truck of the tender broke a bolt connecting parts of a frog, whereby a wheel in the rear truck of the tender was derailed.   The plaintiff's case rested primarily on the evidence of Cook, who was the conductor of the train derailed.   He states the undoubted fact that there was found after the accident a broken bolt, and says it was bolt No. 1, used to hold together the guard rail, the filler block, and a point of the frog.   Although on the first trial of the action he testified that the bolt found was the one that held the wing spring of the frog together, his evidence now is that bolt No. 1 has no relation to the wing spring, and that he meant that the bolt held the point of the frog.   His description of the frog and its construction is practically embodied in Exhibit No. 1, which he states to be a diagram of the frog, and which he submitted as such to Hoppin, plaintiff's expert, and upon which Hoppin bases his testimony. This diagram shows a bolt, No. 1, fastened through the guard rail, the filler block, and the point of the frog; and Cook's statement is that the effect of loosening the bolt is to allow the end of the frog to rise.   The expert, Hoppin, gives his judgment upon the theory that Cook's description of the filler block and the manner of fastening it is true.   Hoppin repeatedly states that the filler block is only held in place by the bolt, and that, with the bolt gone, the filler block would be movable.   He states:

"If bolt No. 1 was broken, there would be nothing to keep the filler block in place. The block could be then pushed out of place and lifted. If bolt No. 1 was broken, the point of the frog would move slightly upwards in the air, if weight was supplied along the southerly end of the frog."

He restates his position in this way:

"If bolt No. 1 was broken, the effect on the filler block of the wheel passing over the point of this rail would be that the filler block would get out of place and the wheel would ride the rail. The flangeway would not be deep enough to take it."

It should be observed in this connection that by Hoppin's evidence, even, it appears that:

"The function of that bolt is to hold rigid the point of the frog against the guard rail on the inside. * * * The purpose of it is to help strengthen the point of the frog, to make the point of the frog hold rigid as against the lateral pressure of the wheel as it passed over the point; that is, the pressure which would tend to shove it to the right or to the left. The purpose of its being there was to make that frog point more rigid and less liable to give to the thrust of the wheel in either direction. By direction I mean right or left in

the plane of the surface of the earth. This filler block is shaped to fit in where it is. It is wider than the opening that is between the two rails. It is intended to fit up, and does fit up, and ought to fit up, closely to those rails, under the top. The reason for fitting it in in that way is to complete the rigidness of it. It is built larger at one end than the space between the two rails, so that it won't go out through that opening. The motion it has is back and forth and parallel to the rail. That block would have an up and down motion at the point where these two rails are after this bolt was broken. In its normal condition it could not move up or down. * * * One of the functions of bolt No. 1 was to hold the filler block, the point of the frog, and the guard rail rigid, and prevent the point of the frog from having a lateral motion. It would also help keep the point of the frog from rising."

The witness states:

"That filler block is not held in place by any other bolt or·rivet through it than bolt No. 1."

This witness never saw the track itself, and bases his evidence entirely upon diagram, Exhibit 1, which he made from Cook's statement, and a picture selected by Cook from a variety of illustrated frogs. But Hoppin's evidence is worthless, because the weight of evidence is to the effect that Cook was mistaken, and that the filler block was not only held in its place by its adaptation between the rails and by bolt No. 1, but that a rivet passed the filler block and held it in place. So that it is a question whether Cook's evidence shall be accepted, or evidence produced by the defendant.

The evidence of the defendant shows three things. It shows that the bolt found was not bolt known as "No. 1," nor used for the purpose ascribed to that bolt, but was a bolt used at spring No. 2, and if it was that bolt, concededly it could not have caused the accident, and the judge so charged the jury. Kerwin, the track supervisor, and Art, foreman of the wrecking train, stated that it was such bolt. Moreover, it shows that, even if the bolt had been removed, the filler block could not have been moved, on account of its close adaptation and conformation to the rails, so as to have caused the accident; and, in the third place, it appears that the filler block was riveted in the manner above stated. Kerwin, the track supervisor, states:

"There was a rivet driven down or going down through the filler block. through the lower side of the frog plate. It was riveted on both sides. That was the condition of the filler block before and after the accident. There was· no injury or breakage of any kind at the frog point. * * * The filler block had not been disturbed. It could not be moved without breaking that rivet."

Art testified that he went to the point of the frog after the accident, picked up the broken bolt, that he saw the filler block, and continuing says:

"There was a filler block there at the point of that frog. I saw the place· where the bolt was that went through them both. That bolt was not broken. I_know how that filler block was fastened to its place there. One bolt was· through it, and a rivet was driven through from the top and down. There was· a bolt that went across from the track and went through the filler block and. then into the wing rail and was fastened by a nut at each end. In addition· to that, there was a rivet in the filler block."

Cook did not return to deny the presence of the rivet, nor was his· attention called to the matter upon his examination. He testified that.

he had never examined the frog critically. I think that the evidence of an extra conductor, whose knowledge of the detailed construction of the frog was such as a person with his duties would ordinarily observe, and who had not made a studied examination, is not equal in force and should not be preferred to the evidence of one whose business it was to know about the construction of the track, and who made an examination immediately after the accident, supported by the evidence of the foreman of the wrecking train, who made a like examination.

It is also my judgment that the weight of evidence is that bolt No. 1 was not broken, but that it was the bolt which Cook described on the first trial, in which he is supported by the witnesses for the defendant. In addition, the evidence of the defendant's witnesses is very persuasive that the filler block could not have moved out so as to cause the accident within the short space of time mentioned by Hoppin. Hoppin's theory with reference to that is that the forward flat wheel of the tender broke the bolt, and that then the filler block moved forward. He says:

"The wheel itself would not do it, but it would be the action of the train passing over the frog. The wheel that broke it would not kick it out—would not take it along with it. The wheel behind it [the second wheel of the forward truck] would not; the second wheel of the same trucks. The hind wheel of the second truck would ride on it. That is the first wheel that would touch it, in my opinion. That wheel would either force it out or ride the rail. That wheel would be the one that would force it out."

Elsewhere he says:

"The next wheel would probably ride that point and leave the rail, and the filler block would become dislodged here from this place, and there would not be a place for the flange of the wheel to pass along, and it would rise above the top of the rail."

So this solid filler plate, wedged in, according to this witness, would rise from its seat during the space between the two trucks of the tender, so that the rear wheel of the tender would ride on it and be derailed.

Kerwin, the track supervisor, said that he saw no marks on the track of any derailment, only at a point five feet beyond spring No. 2. Art stated that the first evidence of derailment found by him was some eight feet from the point of the frog. Cook stated that the entire track, from the frog north to the point of collision, was torn up.

The judgment should be reversed, and a new trial granted; costs to abide the event. All concur.