In re SCHMIDT'S WILL.

(Surrogate's Court, New York County. September 23, 1912.)

1. WILLS (§ 166*)—CHANGE OF INTENTION—UNDUE INFLUENCE—EVIDENCE.
    A change of testamentary intention alone is not conclusive evidence of undue influence, though declarations of the testator are admissible to show what his intention was, under a charge of undue influence.
    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

2. WILLS (§ 54*)—TESTAMENTARY CAPACITY—EVIDENCE.
    When evidence is given in testamentary causes of aberrations or singular actions, it is always important, as a standard of comparison, to show the normal conduct and the intellectual character of the testator in times of conceded sanity.
    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 131–134, 136; Dec. Dig. § 54.*]

3. EVIDENCE (§ 598*)—WEIGHT OF EVIDENCE—NUMBER OF WITNESSES.
    The weight of evidence is not determined by the number of witnesses.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2450–2452; Dec. Dig. § 598.*]

4. EVIDENCE (§ 508*)—OPINION EVIDENCE—SUBJECT-MATTER.
    The opinions of skilled witnesses are admissible, whenever the subject is one upon which competency to form an opinion can be acquired only by a course of special study or experience.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2311; Dec. Dig. § 508.*]

5. EVIDENCE (§§ 506, 510*)—EXPERT TESTIMONY—INSANITY—TESTAMENTARY CAPACITY.
    An attending physician may testify directly as to the fact of insanity, but not as to competency to make a will.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2309; Dec. Dig. §§ 506, 510.*]

6. EVIDENCE (§ 574*)—EXPERT TESTIMONY—WEIGHT.
    The opinion of a physician as to the sanity of a testator, drawn from a hypothetical statement of facts, no matter how correctly stated, cannot be accepted in preference to direct and positive testimony contradictory thereto.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2400; Dec. Dig. § 574.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. EVIDENCE (§ 574*)—INSANITY—MEDICAL DOCTRINES—FACTS.

If a testator was proven to be rational on certain days, a medical diagnosis that from certain pathological symptoms he could not be rational on any day is in law rejected, and the fact proven prevails in law over the medical theory.

[Ed. Note.—For other cases, see Evidence,. Cent. Dig. § 2400; Dec. Dig. § 574.*]

8. WILLS (§ 55*)—TESTAMENTARY CAPACITY—EVIDENCE.

In an action to declare a codicil invalid for testamentary incapacity, evidence *held* to show that testator was at times competent and rational after an apoplectic stroke.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–161; Dec. Dig. § 55.*]

9. WILLS (§ 52*)—INSANE PERSONS—LUCID. INTERVALS—BURDEN OF PROOF.

Although an insane person, or one who was at times deprived of reason by illness, may in a lucid interval make his last will, the burden is on those upholding such a will to show that it was made in such lucid interval.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 101–110; Dec. Dig. § 52.*]

10. WILLS (§ 114*)—ATTESTATION—PURPOSE.

Attesting witnesses are required to see that a testator has capacity and that he executes it under free conditions and as required by law.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 277–279; Dec. Dig. § 114.*]

11. WITNESSES (§ 321*)—IMPEACHMENT OF OWN WITNESS.

A party cannot impeach his own witness, nor say that he is not entirely worthy of belief.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1094, 1099, 1100; Dec. Dig. § 321.*]

12. WILLS (§ 55*)—INSANITY—LUCID INTERVALS—EVIDENCE.

In an action to declare a codicil invalid for incapacity of the testator, evidence *held* to show that, though testator was at times irrational, he was not so at the time of the execution of the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–161; Dec. Dig. § 55.*]

13. WILLS (§ 324*)—TESTAMENTARY CAPACITY—APOPLEXY.

Whether one who has had an apoplectic seizure, which deprived him of reason for a time, has testamentary capacity, is a question of fact to be decided from the evidence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 225, 767–770; Dec. Dig. § 324.*]

14. WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE.

In an action to declare a codicil to a will invalid, evidence *held* insufficient to show undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

15. WILLS (§ 166*)—"UNDUE INFLUENCE"—SUFFICIENCY OF PROOF.

"Undue influence," invalidating a will, being a species of fraud, and importing coercion, compulsion, and overreaching of a vicious kind, must be proved precisely, or inferentially by irresistible inferences, as the law never infers crime or delict when any other construction is possible.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*

For other definitions, see Words and Phrases, vol. 8, pp. 7166–7172.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

139 N.Y.S.—30

Application for the probate of a codicil to the last will and testament of Oscar Egerton Schmidt, deceased. Decree entered, admitting the codicil to probate.

Frederick De P. Foster, of New York City (Mr. Hartfield, of counsel), for proponent.

Taylor, Jackson & Brophy, of New York City (Mr. Taylor, of counsel), for contestant Oscar Stevens.

William A. Alcock, of New York City, for Elise von Frisching.

Carter, Ledyard & Milburn, of New York City, for Seamen's. Church Institute.

Winthrop & Stimson, of New York City, for New York Orthopædic Dispensary, and Hospital.

Katz & Sommerich, of New York City, for Ida von Hagen.

Ernest F. Ayrault, of New York City, for F. Leopold Schmidt, Jr.

Joseph R. Truesdale, of New York City, for Helen Stevens. Schroeder.

Timothy Murray, special guardian.

FOWLER, S. On June 1, 1905, Oscar Egerton Schmidt, a resident of this city, made his last will and testament in due form of law, which is not disputed. This instrument has been duly proved and is entitled to probate. By the second clause of this undisputed will testator devised the estate, consisting of some 317½ acres and a house, all known as the "Poplars" and situated at Lloyd's Neck, Long Island, in the county of Suffolk, state of New York, together with the appurtenances and the portraits of the Lloyd family contained in the house, to his namesake Mr. Oscar Egerton Stevens. On the 3d day of December, 1908, a codicil to this will purports to be made by the testator, whereby, inter alia, he revoked the devise of the "Poplars" to Oscar Egerton Stevens, and in lieu thereof gave him the sum of $25,000. Testator was then about 69 years of age and had suffered an apoplectic seizure in 1906. Mr. Oscar Egerton Stevens now contests the probate of the codicil, alleging undue influence in the procurement of the codicil and a want of testamentary capacity on the part of the testator on December 3, 1908, the date of the codicil.

At the time the will was executed the testator, Mr. Schmidt, was a widower and childless. He had then title to the estate known as the "Poplars" through the will of his wife, devising it to him in fee simple. During the lifetime of both Mr. and Mrs. Schmidt it appears. that a young relative of Mrs. Schmidt, the son of Mrs. Schmidt's first cousin, was much at the "Poplars," and doubtless was regarded. by both testator and his wife with affection and interest; they having no children of their own. It was this gentleman who was the devisee of the "Poplars" under the undisputed will. That both Mr. and Mrs. Schmidt had most unwisely, as it turned out, indulged young Mr. Stevens in the hope of inheriting the "Poplars," as the Lloyd's Neck property was known among them, is apparent.

It appears that Mr. Oscar Egerton Stevens was of the blood of Nelson Lloyd, a predecessor of Mrs. Schmidt in the title to the "Pop-

lars," and therefore the bequest of the Lloyd family portraits and the original devise of the estate in question to him by testator were eminently proper under the conditions which prevailed prior to the date on which the codicil was executed. The estate had originally belonged to the members of the family of Lloyd, and both Mrs. Schmidt and Mr. Stevens were descended through female lines from the original proprietors of Lloyd's Neck.

During Mrs. Schmidt's lifetime, and at the date of his will, Mr. Schmidt had other resources besides the real estate known as the "Poplars." In Mr. Schmidt's lifetime this real property was little more than farm property in the main. The house was modern and of wood, and both land and buildings were of no great intrinsic value; but, like many another Long Island property, it had been for a long time held by the descendants of the original settlers, who in this case were the Lloyds. It was, however, only in recent times that this particular portion of Lloyd's Neck had come to have the substantial or considerable valuation which is now conceded to it by all the parties to this controversy. That Mrs. Schmidt in her lifetime was seised of the estate in fee simple is sufficiently established by the fact that she devised it in fee simple to her husband, this testator. Her power of disposition over it was plenary, as was her husband's.

[1] That the testator was at the date of the codicil under any legal or even equitable obligations to hand over the "Poplars" at his death to Mr. Oscar Egerton Stevens is not apparent. Such a contention cannot be the subject of controversy in any event in this court. Mr. Schmidt, at the time of the will and codicil, held the legal title to the "Poplars" estate and was possessed thereof in his own right. He enjoyed it in full dominion and property, and here at least his inherent jus disponendi, or legal right to dispose of it as he chose, cannot be disputed or controverted. Whatever expectation Mr. Oscar E. Stevens may have entertained in respect of the estate in question in this court must be regarded as a mere spes successionis. Doubtless the declarations of Mr. Schmidt as to his fixed testamentary intentions in respect of Mr. Stevens are to be considered by the surrogate under the issues raised by the pleadings, although a change of testamentary intention alone is not conclusive evidence of undue influence in any probate cause. Lawrence v. Lawrence, 4 Wkly. Dig. 299.

The main question for the surrogate on the evidence adduced in this cause concerns the testamentary capacity of Mr. Schmidt on the 3d day of December, 1908, the date of the writing propounded as a codicil. Had he or had he not then testamentary capacity? It appears that when in normal health Mr. Schmidt was a man possessed of a fair mind; at least there is no evidence which shows him to have been in his best days a man of exceptional mental attainment or power. That he was a pleasant, easy-going, extremely well-mannered gentleman, of correct life when in health, the evidence abundantly discloses, and nothing more of consequence as to his normal characteristics.

[2] When evidence is given in testamentary causes of aberrations, or singular actions, or casual eccentricities, or acute conditions of testators, it is always important, as a standard of comparison, to show

the normal conduct and the intellectual character of the person under investigation in his times of conceded sanity; otherwise, a precise standard of comparison is wanting. From the evidence in this cause it is also apparent that in his normal periods Mr. Schmidt was always somewhat indolent, or inclined to do for himself no more than he was obliged to do. He habitually delegated his business and cares as much as possible to others. Much evidence has been given of a certain outward grace of manner and bearing on the part of Mr. Schmidt before his first apoplectic seizure in the year 1906. But there is no competent evidence which shows that in his best days he was a man of more than ordinary intellect, or that he was of dominating will or extraordinary capacity. In the great Parish Will Case, so often cited in our courts, it was clearly established that Mr. Henry Parish, in that case the alleged testator, was before his seizure a dominating man of marked power and unusual mental force. Thus a proper foundation was laid to contrast his condition in time of weakness and ill health. In this cause I can detect no such evidence of force of mind or dominating habit on the part of this testator. On the contrary, it appears that this testator always and habitually delegated as much as possible to others, and that this was a normal characteristic of the testator, even before he was taken ill in 1906.

That at periods of his life after 1904 this testator lived far beyond his means, and even when his personal estate was almost or quite exhausted kept a house in the city of New York, a house in the country, a carriage and horses, and a large staff of servants, is disclosed by the testimony; and these facts are not without legal bearing when we come to inquire whether the actual disposition of his real estate by the codicil is consistent or inconsistent with testator's sanity or his prior expressed testamentary intentions. That such facts have some bearing on the supplemental disposition of the property first devised to Mr. Oscar Egerton Stevens is apparent. When testator had come to the end of his cash resources, and had practically nothing to fall back on except the country real estate, received from his wife, which was nonproductive to any appreciable extent, various dispositions of the "Poplars" were made, both by way of mortgage, deed of trust, and the codicil, which were all inconsistent with the original devise to Mr. Stevens. In 1909 the estate was mortgaged for $50,000. In 1908 it was conveyed in trust to trustees, and the codicil was then made revoking the devise to Mr. Stevens and giving him $25,000 in lieu thereof. There is evidence that all these things were the product of Mr. Schmidt's own directions, if he had capacity to give them.

The question remains: Was this codicil the legal act of a capable testator or the act of some one else? Even though the various dispositions mentioned were consistent with Mr. Schmidt's actual needs, that does not of itself establish that they were valid acts, if the testator lacked capacity, or was then the victim of the coercion or fraud clearly alleged in this cause. The surrogate is confined, of course, to the issue of validity of the codicil alone; the validity of the mortgage and the trust deed not being the subject of any inquiry in this court.

At the dates of the will and the codicil it appears that testator had relatives of his own blood, consisting of at least one brother and

one sister, and various nephews and nieces, mainly residing abroad. None of those particular relatives of testator whom he ultimately turned to in his final extremities, however, seemed to have profited by the questioned codicil, and this is important when we come to consider the charges of undue influence and fraud. After the death of testator's wife in 1904, and while he still had some resources other than the real estate, the main and constant companions of his life appear to have been relatives or connections of his late wife and of the contestant. With them or their connections testator lived much of the time between 1904 and 1908, or at least until his cash resources were impaired or nearly exhausted, when he, of necessity, turned to those of his own blood for the active assistance which his disordered finances peremptorily required. This aid they did not decline. It is, however, claimed by Mr. Stevens, the contestant, that after an apoplectic seizure in 1906 testator's mind was so impaired as to render him incapable of a testamentary act, or, if not, to render him unduly susceptible to the fraud and undue influence clearly charged in this cause.

The contestant concedes, and he must concede, that the will of 1905 was the valid and proper testamentary act of a capable testator; for contestant's rights and entire standing in this court flow from that instrument alone. His contention is that between 1905 and 1908 a great change occurred in testator's condition, so great as to incapacitate him for any further testamentary act. It appears that in late June or early July of the year 1906 Mr. Schmidt, the testator, suffered from an apoplexy, or what is commonly called a "stroke," resulting in partial paralysis. He was then sojourning at the "Poplars," where Mr. and Mrs. Ledyard Stevens and their daughter were also residing by some arrangement with testator. They had come to live with him in his town house in Eighth street, in this city, in 1905, and had continued to reside with him. Mr. Ledyard Stevens was the uncle of contestant, but neither he nor his wife was a connection of the testator. At that time it seems to have been quite understood that the "Poplars," the country home of testator, was destined to pass under Mr. Schmidt's will to Mr. Ledyard Stevens' nephew, the contestant, and thus a sort of community of interest existed between testator and Mr. Ledyard Stevens' family, which they at least understood to be unalterable. Whether the testator ever so understood it I doubt, if his subsequent rupture with the Stevens family and the codicil furnish any evidence of his own understanding of his situation.

The autumn of 1906 found Mr. Schmidt again in his Eighth street house. Mrs. and Miss (Ledyard) Stevens, who had returned there with him, then proposed to break up their joint living arrangement and to go abroad. Mr. Schmidt wished to join them, and by the advice of his physician was permitted so to do. He and his valet, Jones, accordingly proceeded to Europe with the ladies in January, 1907, returning in the spring of the same year after a rapid visit to Paris, Rome, and Naples, among other places. Such an exacting tour, whether advisable or not for an invalid, certainly indicates that testator's physical condition was better than that which must have en-

sued immediately after his severe stroke in June or July of the year 1906.

It is to be observed that his visit to Europe was suggested by himself, and that the suggestion was entertained with the respect usually accorded only to persons mentally competent. It is hardly conceivable that an entirely demented man would have been suffered to go abroad with a letter of credit in his own name, accompanied only by two ladies of his acquaintance and an untrained valet as his single attendant. The conclusion is irresistible that in 1907 there was some amelioration of the grievous mental and physical conditions which first followed the stroke in 1906. If we once concede that there were times after the stroke in 1906 when testator was mentally competent, the legal principle applicable in this case is somewhat simplified.

Unfortunately for him, in Naples, in the spring of 1907, the testator suffered some sort of a relapse, and was then brought to his home in New York in what is conceded to be a deplorable state of mind and body. The testator, after several months' stay in New York City, was, however, able to be removed in May of 1907 to the "Poplars," where he was confined to his bed for some time, but toward the end of the summer of 1907 he again improved sufficiently to come down stairs. During all the summer of 1907 testator was under the eyes of the Stevens family. His own family was not with him to any considerable extent, if at all, and the testator's precise mental condition during that summer is more or less a subject of dispute. It may have been as bad as Mrs. Ledyard Stevens thought; but there are circumstances which point to no grave or permanent conditions, except those which the first apoplectic seizure always entails.

In the autumn of 1907 it appears testator again removed to his house in Eighth street, this city. Then it was that Mr. Ledyard Stevens and his family terminated their residence with testator. Their testimony after that throws little light on the inquiry. After their departure, in any event, his condition improved. Mr. Schmidt remained in the Eighth street house until the spring of 1908, when he again went to the "Poplars," at Lloyd's Neck, where he was in constant residence through the summer of 1908 and the winter of 1908–09, and, indeed, until the latter end of the year 1909. This long sojourn at the "Poplars" covers the precise period of the execution of the codicil of December 3, 1908, and it is unnecessary for us at this time to follow testator's movements farther. Mr. Schmidt lived on until April 21, 1911, when he died in a new house which he had himself acquired in Ninety-Third street, in the city of New York, never having revoked the codicil of December 3, 1908.

It has been stated that the Ledyard Stevens family ceased to reside with the testator after the autumn of 1907. From that time testator's nephew, Charles De Rham, and testator's partner, Mr. Tompkins, ministered to his wants, but to a degree which is the subject of acrimonious discussion or implication in this cause. It was during their co-operation with testator, whatever it was, that the troublesome codicil was made. The entire bona fides of Mr. De Rham's ministrations to his uncle was not seriously questioned by the counsel for

Mr. Stevens on the trial. Indeed, one of the counsel for Mr. Stevens went so far as to disclaim in open court any attack upon Mr. De Rham and volunteered to speak of him with a respect and admiration quite inconsistent with an implication of bad faith and undue influence on Mr. De Rham's part. The surrogate cannot be expected to view this disclaimer with equanimity, if it is calculated to devolve on him alone the responsibility of inquiring on his own account, whether Mr. De Rham's actions were or were not illegal in respect of the codicil.

The charge of undue influence in this court is a serious charge, and if followed by sufficient proofs suffices to avoid a testamentary act. If the actors so charged are to be found guilty, there is no room for eulogiums of them or disclaimers of their intended guilt. Certainly such disclaimers are out of order so long as such serious charges are pressed to a conclusion or are suffered to stand on the record. It cannot be otherwise than that Mr. De Rham, Sr., is implicated in the contestant's charge of undue influence, for Mr. De Rham was an active agent in all matters connected with the contested codicil of 1908. If by such disclaimer of counsel it was intended to charge that Mr. Tompkins, the friend and copartner of testator, was the only guilty agent of undue influence, the surrogate is forbidden to accept this assertion, as Mr. Tompkins and Mr. De Rham were co-operating in all the matters of any significance in this controversy. If one gentleman was guilty, both were; and if not both, neither. But the consideration of undue influence may be reserved until the major contention of insanity or testamentary incompetency is first disposed of by the surrogate.

Was or was not Mr. Oscar Egerton Schmidt competent to make a codicil to his will on December 3, 1908? This is the major issue in this cause. The evidence bearing on testator's capacity on December 3, 1908, is twofold, lay and professional, or expert. We must first consider the effect of the professional or expert testimony in this case. On his return from Naples in the spring and afterwards in the fall of 1907, testator was attended by Dr. Partridge, a leading physician of the quarter in which testator then lived. There is no doubt that testator was then very ill. This physician states that there was then evidence of senility as the result of the stroke of 1906, and that testator suffered from bladder trouble. Dr. Partridge consequently turned testator over in 1907 to a specialist for that last-mentioned complaint. After that Dr. Partridge rarely, if ever, saw testator.

It will be observed that this very competent physician refused to characterize testator's complaint as "senile dementia," and he is contestant's own witness. He does state that there was evidence of mental incapacity, senility, and almost imbecility *"for the time being."* Dr. Partridge is absolutely unable to testify whether or not the testator's condition was improved in the year 1908. He was of the general opinion, however, that the conditions observed by him were not susceptible of improvement. But this prognosis, for prognosis it was, must give way to the facts which are in evidence. The surrogate is unable to conclude from the evidence of this excellent physician, under oath, that at the date of the codicil, in 1908, testator was then

mentally incompetent. The evidence of this particular physician in law falls very short of itself of establishing that fact. It does establish the serious condition of testator in the year 1907.

Dr. Partridge in the autumn of 1907 was succeeded by Dr. Brouner, a specialist for bladder troubles. This medical gentleman states that at times when he saw testator in the late months of 1907, or early months of 1908, testator was incompetent to appreciate what was going on around him. But Dr. Brouner never saw testator after the spring of 1908. He treated the testator for a mechanical obstruction successfully, and that was all. Dr. Brouner does state that at times during the treatment testator was clear in his ideas, and at other times his ideas lacked concatenation. He also states that, on the majority of the visits when he saw testator, testator was not competent mentally to appreciate what was going on around him. Such evidence falls very far short of proof that testator in late 1907 or early 1908 was suffering from incurable dementia or permanent want of mind— "mens insana." While the evidence may be significant in connection with other testimony, it does not of itself establish that on the 3d day of December, 1908, testator lacked capacity to testamentate, and that is the real point at issue.

Dr. William B. Gibson, of Huntington, Long Island, was the attending physician of testator in December, 1908, the date of the codicil in controversy. Dr. Gibson was coroner of Suffolk county, an examiner in lunacy, and obviously an experienced practitioner in the part of the country where testator mainly resided. Dr. Gibson testifies to testator's physical condition, his paralysis, and local difficulties. It was entirely competent for contestant to put to this medical attendant the general question of testator's sanity or insanity in December, 1908, leaving the facts to be brought out in cross-examination. People, etc., v. Faber, 199 N. Y. 256, 92 N. E. 674, 20 Ann. Cas. 879; Weibert v. Hanan, 202 N. Y. 328, 95 N. E. 688. But no such question was put or answered. Had it been put and answered in the negative, the answer would have been entitled to great attention from the surrogate. But there is absolutely nothing to that effect stated by Dr. Gibson. His actual testimony is most inconsequential in law. His response to the hypothetical question was not founded on his own observation, but upon an hypothesis, the legal effect of which will be considered when we come to weigh the purely expert testimony in this cause.

The only other medical man who testified from observation prior to the codicil was Dr. Coerr. This gentleman, while on several social visits in the year 1907 to the family of Mr. Ledyard Stevens, then living at testator's house, met the testator casually. This witness testifies to testator's senility, his repetitions, and the character of his anecdotal conversation. In cross-examination, this witness detailed the subjects of the interview. The detailed conversations testified to evince nothing from which the court may infer mens insana or want of testamentary capacity on the part of testator in December, 1908. The witness does testify to a senile state or condition; but his entire testimony falls far short of that which is necessary to establish permanent insanity or testamentary incapacity, if we have regard to un-

disputed evidence of the periodicity of testator's attacks, his constant recuperations, and only occasional lapses into a somnolent, a forgetful, a wandering, or an oblivious state of mind.

[3] We come next to the legal effect of the expert evidence in response to the hypothetical question put by contestant and proponent. Two experts testified for contestant; Dr. Gibson, the attending physician, already mentioned, and his son, Dr. Gibson, the younger. Upon a detailed statement of the facts assumed to be proved by contestant they both affirm that in their opinion testator was insane on the day he made the codicil, December 3, 1908. The younger Dr. Gibson also states that from his own observation while attending testator in 1909 (a year almost after the codicil) testator was then insane, and that such condition was then progressive. See Miller v. Miller, 150 App. Div. at page 611, 135 N. Y. Supp. 773. On the other hand, Dr. Dold, a specialist in mental disorders, called for the proponent, upon an hypothesis which the surrogate is constrained to say more nearly approximated to the facts proven in this cause, was of the opposite opinion, and testified that on the 3d day of December, 1908, the date of the codicil, testator was sane. It is not in our law as it was in the civil law that the weight of evidence is determined by preponderance of numbers. Many facts enter into the weight of evidence, other than number of witnesses to a given point.

[4, 5] The opinions of skilled witnesses are admissible whenever the subject is one upon which competency to form an opinion can be acquired only by a course of special study or experience. Dougherty v. Milliken, 163 N. Y. 527, 57 N. E. 757, 79 Am. St. Rep. 608. It is customary in testamentary causes, involving an issue of sanity, to receive such evidence when it involves complicated symptoms or the causes or effects of disease. In such a case the attending physician may testify directly to the fact of insanity (People v. Truck, 170 N. Y. 216, 63 N. E. 281; People v. Faber, 199 N. Y. 256, 92 N. E. 674, 20 Ann. Cas. 879), although he cannot in this state testify to incompetency to make a will (Wyse v. Wyse, 155 N. Y. 367, 372, 49 N. E. 942; Curtis v. Hudson Valley Railway Co., 147 App. Div. 349, 131 N. Y. Supp. 758; Matter of Mason, 60 Hun, 54, 14 N. Y. Supp. 434).

One who is not an attending physician or an observer can testify only to his opinion on an hypothesis. But the value of an answer to an hypothesis always depends on the precise correspondence of the hypothesis to the facts found to be true in a cause. This must be so; for if an irrelevant or incomplete hypothesis is put to the expert, his opinion cannot aid the trier of fact. No more difficult task, therefore, is ever placed on counsel than the framing of a hypothetical question to a man of science. It calls above all for accuracy and for exact scientific information in the questioner, but also for the exercise of the logical faculty in directing the question to essentials and not to nonessentials. Otherwise the question and answer are a hindrance, rather than a help, in the administration of justice. A one-sided question, an irrelevant hypothesis, or a defective hypothesis, is an obstruction instead of an aid to the surrogate. Seifter v. Brooklyn Heights R. R., 169 N. Y. 254, 62 N. E. 349; Miller v. Miller, 150 App. Div. 604–611, 135 N. Y. Supp. 773; Faudington v. Erie R. R., 136 App. Div. 737, 121

N. Y. Supp. 428; Weibert v. Hanan, 136 App. Div. 388, 392, 121 N. Y. Supp. 35.

[6] But even if the question is skillfully put, in no case can a trier of fact accept a mere opinion of an expert on a condition in fact in preference to direct and positive testimony contradictory of the expert's conclusion. Poynton v. Poynton, 37 Ir. L. T. R., 54; Aitkin v. McMeckan, 1895, A. C., 310; Dougherty v. Milliken, 163 N. Y. 527, 533, 57 N. E. 757, 79 Am. St. Rep. 608. In the case now before the surrogate speculations and hypotheses concerning testator's chronic insanity after 1906 are worthless, in face of the fact, established in this cause, that this testator was at times after 1906 rational, and only at other times irrational. The precise question for the surrogate, as the proofs actually stand, is whether or not testator was rational on the day he purports to have made the codicil, to wit, December 3, 1908, and not whether he was at all times rational. That after the stroke of 1906 testator was occasionally rational is clearly proven by a preponderance of the testimony given by his associates and disinterested relatives, all intelligent people of good standing in the community. That the testator occasionally was irrational is, however, sufficiently proved to cast upon the proponent additional burdens of proof in this cause, but nothing more. This point we shall consider later when we come to consider the manner in which these additional burdens have been discharged.

While the opinions of the physicians called to the stand in this matter seem formidable in the mass, yet when analyzed they are little to the point in this controversy, if we have regard to other facts proved beyond peradventure. The opinions of experts are not conclusive upon the trier of fact. Dougherty v. Milliken, 163 N. Y. 527, 533, 57 N. E. 757, 79 Am. St. Rep. 608. They do not relieve the surrogate of the duty of weighing the evidence, including the opinions of the experts themselves. If the effect of expert opinion were to relieve the court of such responsibility the burdens of judicial station would, indeed, be light. Each side would then defray the outlay for the desired conclusion, and the court could wash its hands of all responsibility. Such is not, however, the law.

In judicial investigations concerning legal capacity or responsibility the courts of justice have been compelled to frame for themselves certain tests and rules which they regard as more direct, simple and conclusive than those prescribed by the medical profession as tests of mental derangements. M. Troplong, the first President of the Cour de Cassation of France, in his well-known work on "Donations Entre-Vifs et des Testaments," alludes to the differences between the medical tests and the judicial tests of insanity. Unfortunately there is no English version of the work of this great French lawyer. In substance M. Troplong says:

"What I have seen and heard of certain physicians in my judicial career passes all belief; there is not a man whom they would not declare a monomaniac in listening to them. If Pascal was not dead, he should take care; for I know many a doctor who would regard him as laboring under an hallucination. Socrates is very happy to have been born so soon; he has at least perished with the repute of being the wisest of men, whereas more than one

medical expert would now have characterized him as a monomaniac with his familiar demon!"

Such, at least, is my own rendering of the remarks of this great and learned French master of the Law of Wills.

[7] While the passage just quoted has little precise application to the facts of this case, and while it is quite unfair to the learned medical profession of this country as a whole, it serves well to emphazise the fact that there is a recognized distinction between the medical and the legal tests of mens sana. The medical tests are those applied in the diagnosis and cure of diseases of the mind. The legal tests are applied in the administration of exact justice and in determining the validity of the acts of civil life. Very slight symptoms may need cure, and yet not deprive the patient of his freedom to act or to will. To apply the distinction in this cause: If testator was proven to be rational on certain days, the medical diagnosis that from certain pathological symptoms he could not be rational on any day is in law rejected, and the fact proven prevails in law over the medical doctrine or theory. I yield to no man in my respect for the medical profession in its own sphere, and I consider their opinions at all times as very worthy of attention; for they are the opinions of experienced men and skilled observers. But their judgment is not always that of the courts, and it is the rulings of the courts which alone bind me.

That Mr. Oscar Egerton Schmidt was sometimes, if not at all times, rational after his apoplectic seizure in 1906 the evidence clearly shows. He was president of the Orthopædic Hospital before his attack in 1906, and he resigned only in the year 1908. After his stroke in 1906 testator attended a meeting and made a report to the trustees in his own handwriting. The episode of his trip to Europe in 1907 and the respectful treatment by Mr. and Mrs. Ledyard Stevens of Mr. Schmidt's suggestion that he go along shows that these constant companions thought him then competent to cross the sea and take a great journey in a foreign land among strangers. Mrs. Ledyard Stevens distinctly states that after his stroke testator at times seemed better, and that on some days he was brighter than others. This is only important because it comes from contestant's own witness. It is, however, consistent with better testimony to the same effect.

The testimony of the trained nurses, Miss Wallace and Miss Pomeroy, shows that both after testator's stroke in 1906 and his relapse in 1907 testator improved so as to walk, go out for visits, and take part in ordinary conversations. That testator was seriously ill, both after his stroke in 1906 and after his return from Europe in 1907, is apparent. That he was not demented, or in articulo mortis, even in the summer of 1907, is evident from the great number of visitors entertained at the "Poplars," where he then resided and where he was the master of the house. It is not to be supposed in view of that fact that his condition then caused alarm, or that he required great seclusion or tranquillity, or anything more than ordinary nursing and confinement to his apartment. It was during this summer of 1907 that testator's ready money or personal resources were being so quickly exhausted as to make a resort in some form to the real estate designed

by the will of 1905 for Mr. Oscar Stevens indispensable. Whoever is responsible for the undue expenditure at that time must share with testator the responsibility of frustrating the hope of succession which Mr. Oscar Stevens had a reasonable right to entertain.

[8] That testator was at all times incompetent to make a will, in fact, after his first stroke in 1906, is not proven in this cause. That at the end of 1907 and during the winter of 1908 testator was much better than he had been in early 1907 is disclosed by undisputed testimony. He was in 1908 and 1909, and even before, able on Sunday evenings to go out to take supper with his nephew, Mr. Charles De Rham, at the latter's house on Fifth avenue, and while there testator's conversations were obviously those of a rational man. In 1907 testator as trustee attended a meeting of the board of trustees of the Orthopædic Hospital, and his conduct was entirely rational. That at least at times he was rational in each year after his first stroke in 1906 is abundantly established in the evidence given in this cause. In 1910, for example, the testator transferred of his own motion and by an instrument drawn by himself a share in the Society Library to his nephew, Mr. Seton. In May, 1909, Mr. Baylis had an interview with testator, and his actions show that testator was then rational. Mr. Seton's evidence is only consistent with testator's entire rationality at some period in 1909. The testimony of Mr. Leopold Schmidt, who has no interest under the codicil, that testator, after his stroke in 1906 and his relapse in 1907, was at least at times rational and of sound mind by legal standards, is of great weight. Consider, also, testator's note of August 12, 1910, to his brother:

"Dear Leopold: Can't make out who you met in Munich. Am better and stronger. Love. Affectionately, Oscar."

And the other note of June 4, 1909:

"Dear Leopold: Thanks for your letter. Your visit added ten years to my life. Affectionately, Oscar."

These unprompted notes were not the notes of an irrational man. Nor is the note to the mother of contestant, in answer to her remonstrance about the execution of the codicil, an irrational note:

"Dear Madam: In reply to yours of the 14th instant, I beg to say that I am quite able to judge for myself as to the rectitude of any action I have taken or arrangements I have made providing for the disposition of such estate as I may leave at my death."

These missives were all written by the testator himself, and were only consistent with rationality for the time being. There is much, also, which I need not detail, in the evidence of disinterested persons of respectability and intelligence which makes it conclusive that after 1906 and 1907 testator was at times rational.

[9] That testator never after 1906 was a well man physically is, however, apparent, as it is that at times he was quite irresponsible and miserably ill in mind and body. The fact that the testator was occasionally rational after 1906 and 1907 disposes of any mere medical prognosis to the contrary made before those dates, and it compels the surrogate to have reference to the long-established principle in tes-

tamentary law that even one furiosus, or mad, or in other words lunatic, may in a lucid interval make his last will and testament. Where an insane condition is established, the burden is, however, on proponents to show with great particularity that a will of such a person was made in a lucid interval. Here testator was not furiosus, or lunatic; but he was at times deprived of reason by illness, and the principle is the same. Coke on Litt. 247a; Clark v. Fisher, 1 Paige, 171, 174, 19 Am. Dec. 402; Matter of Taylor, 1 Edm. Sel. Cas. 375; Matter of Coe, 47 App. Div. 177, 62 N. Y. Supp. 376; Swinb. pt. 2, § 3, pl. 1, 4; Beverley's Case, 4 Rep. 123, 6; 1 Ph. 1184; Brogden v. Brown, 2 Add. 441; Kemble v. Church, 3 Hagg. 273.

The testimony of the nurses and servants, adduced by the contestant, if we give to it all possible credit, establishes only that in times of acute illness and in periods of prolonged recuperation the testator showed symptoms and states of irrationality or irresponsibility. The testimony of the medical witnesses to the effect that the pathological conditions of testator indicated mens insana after the stroke of 1906 must give way, under the rules laid down by the courts, to the fact, abundantly established, that at times the testator was rational. The surrogate is not permitted to allow opinions of even the most learned medical men to control the facts established in a cause.

I do not feel it incumbent on me to go into a prolonged discussion of the details of the evidence establishing the fact of occasional rationality when a summary will suffice. I find from the evidence that after the stroke of 1906 the testator was occasionally rational, or, in other words, sufficiently restored to his original state of mind as to be able to testamentate. This still leaves the real question in this cause as follows: Was the testator so competent on the 3d of December, 1908, the day the codicil purports to be executed? This is the only question in the cause, and the testimony bearing on the testator's mental condition after that date is only consequential in so far as it contradicts the medical hypothesis of a pathological condition which pointed to incurable insanity before December 3, 1908. So far as such subsequent evidence destroys or supports the medical hypothesis it is important, but no farther.

Now, what does the weight of evidence establish concerning testator's condition of mind on the 3d of December, 1908.? In this connection we must remember that the burden is on proponents to show that the codicil was executed in a lucid interval. The codicil was witnessed by three attesting witnesses, Miss Saxton, the housekeeper and attendant of Mr. Schmidt, John Caley, the tenant of testator's farm, and Mr. Frederick F. De Rham, a lawyer and the great-nephew of the testator.

[10] Attesting witnesses are required for the purpose of seeing, in the first instance, that the testator was in such a condition as enabled him to make his last will, and next that he executed it under free conditions and in conformity with the law regulating testamentary dispositions. If an attesting witness has any doubt on the score of the testator's competency, he has no business to make himself an attesting witness to a will; and it is declared a fraud so to do when the witness has doubts on testator's capacity. Scribner v. Crane, 2 Paige, 147, 21

Am. Dec. 81. In the former practice in testamentary causes, where an attesting witness to a will was missing or dead, it was necessary to allege:

"That the witness in question was a person of good character and standing in the neighborhood where he lived, and would not have set his name as witness to a will unless he had seen the same duly executed and was well convinced that the person executing the same was of sound and perfect mind, memory and understanding." Coote's Ecc. Practice, 493.

Whether trespass on the case would not lie against a witness who falsely attested an instrument in favor of those injured I confess I have not fully considered, but that it is highly improper for a person who has doubts of testator's competency to act as an attesting witness to a will, and to certify under his hand that testator was of sound mind when he has no information on that score, I have no doubt whatever.

The attesting witness, Miss Saxton, a woman of intelligence and good origin, who was certainly an untiring, faithful, and entirely competent ministress to her employer (for it is proved that she not only gave him good and intelligent care, but brought order and economy into his then ill-regulated and extravagant household), testified on the stand. She states that the testator on the 3d of December, 1908, at the moment of executing the codicil, was entirely competent, and was under no restraint. It was pressed on the surrogate that there was some evidence of fellow servants of Miss Saxton that on several other occasions she showed signs of inebriety, and much stress was laid, by counsel for contestant, on those circumstances, as, on one occasion at least, these lapses are stated to have occurred in the presence of testator himself, who, it appears, did not reprove them. This is supposed to be significant of his want of mind. There is no pretense that on the occasion of executing the will Miss Saxton was not in full possession of her ordinary faculties and did not conduct herself with her usual good sense and propriety.

We are not permitted to infer that an intelligent and faithful servant is incapacitated from acting as an attesting witness because on one or more occasions there may have been lapses from strict sobriety; nor is an inference to be deduced of testator's want of proper mind because he did not discharge her for such lapse on the spot. Neither inference is to be drawn from the incidents in question. The law draws no final inferences which are not conclusive. An indulgent or easy-going master and friend might well overlook even so grave a lapse from the highest standards (especially if the lapses were slight and only on one or two occasions) in the interest of his own peace, or even by reason of a kindly interest in a servant of the higher order of intelligence who had rendered him faithful and unselfish service. There is still much kindliness in the world. There are as many good as harsh masters. Whatever Mr. Schmidt was or was not, he was shown to be a kindly gentleman. The law, fortunately, has a very lofty standard, and where two constructions, motives, or inferences are possible, it always chooses the best, not the lowest.

It is to be observed Mr. Charles De Rham testifies, from a long and intimate acquaintance with his uncle's household, that he was

much surprised to hear her underservants' imputations against Miss Saxton. But be such imputations true, or be they false, they do not destroy Miss Saxton's testimony, nor disqualify her to act as an attesting witness. In this court she is to be regarded as a credible witness on the occasion of the execution of the codicil, for there she is not impeached, nor is anything shown which destroys her credibility on that occasion.

Frederick De Rham, a lawyer, and an attesting witness of the codicil, testifies to all the acts necessary under the law to establish the codicil as a testamentary instrument, and that the testator was then of sound mind, memory, and understanding. This witness was obviously a truthful and disinterested witness, and I cannot reject his testimony, but must give it due weight. By the Statute of Wills only two attesting witnesses are essential to a will. Here there were three to the codicil. In the celebrated case of Wright v. Doe d. Tatham, 1 A. & E. 3, it was held in substance:

"That the object of the provisions of the old Statute of Wills in regard to attesting wills was not directed primarily to a mode of proving a will when contested, but to the security of the testator at the time of the execution of the will; the statute intending that the witnesses should be in the nature of guards or securities to protect him in the execution of the will against force or fraud or undue influence."

If this were the true construction of the old statute once in force here, it is true of the present statute. Now, the attesting witnesses mentioned were chosen by Mr. Schmidt, and they were eminently proper persons. To Miss Saxton, one of such witnesses, was then confided the care of testator's health and the direction of his household. The other witness, Frederick De Rham, was testator's lawyer and grandnephew, and supervised his affairs. Neither was benefited by the codicil, and there is no reason to suppose that they were not acting in entire good faith in attesting the codicil and making their certificate of the acts well and truly performed and of the testator's competence. That their testimony on the stand was truthful I believe.

John Caley, the third attesting witness to the codicil, was testator's tenant farmer, and his testimony falls very short of establishing either the competence of testator or the due execution of the codicil. Yet Caley signed the attestation clause, certifying to everything required by law for a perfect codicil, and to his own part in it and that testator was competent. He now says he had not been in testator's company, except for five or eight minutes, in eight years, and this was four years prior to the codicil. He confesses to inadequate data for forming any conclusion on such a subject, and opinion he holds none. This witness was by occupation a farmer, and this codicil was the first will ever witnessed by him. Mr. Caley's testimony was very negative on all points, and in law his testimony was unnecessary to establish prima facie the codicil. The evidence of Mr. Caley does not, however, materially conflict with that of the other two attesting witnesses of the codicil, and to some extent it corroborated theirs. It neither proves nor disproves the codicil. If Mr. Caley was not sure of the testator's capacity, he should not have acted as an attesting witness, as it has been declared a fraud to act under the circumstances. Scrib-

ner v. Crane, 2 Paige, 147, 21 Am. Dec. 81. This Mr. Caley probably, as we may at least hope, did not know.

[11] The testimony of two of the three attesting witnesses prima facie established the codicil and the testator's competency to execute it. But the evidence on this point required corroboration, in view of contestant's proof. The proponent in this case is bound to show that the testator was competent on December 3, 1908, even if the proofs of the contestant were largely circumstantial or of an inferential character. That the testimony of the attesting witnesses concerning testator's competency on December 3, 1908, was amply corroborated I am constrained to find. Mr. Tompkins, the old friend and copartner of the testator, was called to the stand by contestant. This means in this state that the witness Tompkins was held out to the court by the contestant to be an entirely trustworthy witness. Contestant cannot impeach him, nor can he say that Mr. Tompkins is not entirely worthy of belief. Coulter v. American Merchants' Un. Ex. Co., 56 N. Y. 589; Pollock v. Pollock, 71 N. Y. 137, 152; Koester v. Rochester Candy Works, 194 N. Y. 92, 97, 87 N. E. 77, 19 L. R. A. (N. S.) 783, 16 Ann. Cas. 589; Bernstein v. Empire Bridge Co., 146 App. Div. 529, 131 N. Y. Supp. 129; Voorhees v. Unger, 151 App. Div. 35, 38, 135 N. Y. Supp. 113.

Now Mr. Tompkins in all essentials corroborates the testimony of the attesting witnesses. It may be quite true that Mr. Tompkins may not have been a successful merchant, and that he and Mr. Schmidt in their joint business lost the money necessary to assure Mr. Oscar E. Stevens' succession to the Lloyd's Neck property. But that fact does not convict Mr. Tompkins of crime nor discredit him as a witness. Mr. Schmidt's actions in respect of the continuation of his partnership with Mr. Tompkins, testified to by Mr. De Rham, Sr., show how considerate Mr. Schmidt's feelings for his old friend, Mr. Tompkins, really were. So testator's conduct in respect of omitting Mr. Tompkins as his executor showed right feeling and delicacy when he said in reference to Mr. De Rham's suggestion to that end:

"No; I do not want to do that. Mr. Tompkins has been a good friend of mine, and I do not want to hurt his feelings by removing him as executor."

Mr. Tompkins was shown to be one of the oldest friends of the testator, a friend of 40 years' standing, almost a lifelong friend. While testator's original wisdom in choosing Mr. Tompkins as his business associate may not have conformed to the highest order of business sagacity, it was not then or later so deficient in intelligence as to bear the construction placed on it by contestant. The loss of money in the partnership dealings and the continued fidelity of testator to his friend, Mr. Tompkins, notwithstanding the loss, and also the attention of Mr. Tompkins to his friend, Mr. Schmidt, during periods of protracted illness, are all consistent with good faith and intelligence on the part of testator, and in the absence of direct proof to the contrary no other construction is to be put upon these incidents of a long life. But in any event, Mr. Tompkins was contestant's own witness, held out by contestant as worthy of belief, and I must so accept him. Now, Mr. Tompkins' uncontradicted testimony establishes

that Mr. Schmidt was a sufficiently capable testator on December 3, 1908. It corroborates in this respect the testimony of two of the attesting witnesses to the codicil. No other possible construction can be placed on it. Mr. Tompkins and Mr. Charles De Rham had long conversations with testator prior to the making of the codicil about his affairs, and then Mr. Tompkins received testator's instructions for the codicil. These instructions were communicated to the very respectable lawyer who prepared the codicil accordingly. The lawyer swears that Mr. Schmidt subsequently confirmed them. That these conversations took place just as Mr. Tompkins testifies I must believe. I have no other alternative, as Mr. Tompkins is not contradicted, and the evidence is that of contestant's own witness. Voorhees v. Unger, 151 App. Div. 38, 135 N. Y. Supp. 113. It appears that in one of these conversations with Mr. Tompkins, testator furnished the names of the legatees named in the codicil.

The part that Mr. Charles De Rham took in all these matters, including the codicil in question, was only such as any fair-minded gentleman would be expected to take in arranging the disordered affairs of an invalid relative with whom he was on terms of intimacy. I do not know whether or not the praise accorded to Mr. De Rham's conduct by contestant's counsel, and already alluded to, was intended to embrace the transactions about the codicil of December 3, 1908. But, if not, the surrogate will supply the omission and infer from the testimony that there was no impropriety on Mr. De Rham's part in respect of the execution of the codicil by testator. It may be observed that the surrogate's recollection that Mr. De Rham's motives were not impugned by contestant is confirmed by a statement to that effect which is a matter of record.

That testator was in December, 1908, competent to make the codicil, as stated by the attesting witnesses, is also confirmed by the testimony of Mr. and Mrs. Wood, of Mr. Flinsch, and Mr. Matheson, his near neighbors in the country. The evidence offered by contestant to the contrary is not sufficiently directed to the time the codicil was made. It is also lacking in sequence and in the circumstances necessary to disprove capacity of testator. Such proofs of contestant are wholly insufficient to counterbalance the direct testimony offered in support of the will.

[12] While the burden was undoubtedly on proponents to show that the testator had capacity to make the questioned codicil, that burden they sufficiently discharged in this cause. Testamentary acts cannot be disturbed by unrelated circumstances, however grave such circumstances may be in themselves. If in 1906, immediately after his stroke, the testator had attempted to make a will, it must have failed. But this he did not do. The codicil was made in 1908, when his condition was proven to be very different from what it had been in 1906 and part of 1907.

[13] It is not the law of this state that an apoplectic seizure, although it deprives a testator of reason for a time, renders the victim forever after incapable of making his last will and testament. The effect of this malady may be lasting and complete, or it may, on the other hand, be to some extent temporary in its disabling effect upon testamentary

capacity. What its effect is in fact is a matter for proof, and not for speculation or hypothesis, in a particular cause.

In the year 1828 the chancellor of this state had before him the will of one who had suffered ·from cerebral apoplexy (Clark v. Fisher, 1 Paige, 171, 19 Am. Dec. 402), and although the decision was adverse to the will, the law applicable to such a case as this was correctly stated. In that case at the time of the act of testamentation the alleged testator was worse, and not better, than he had been. Indeed, he was so bad as to be unable to speak or to give instructions for the will. He could not even make himself understood. That is a very different state of facts from those presented to me in this cause.

In the leading case of Delafield v. Parish, 25 N. Y. 9, the testator after his stroke was unable to. articulate, and, this being so, the principal beneficiary of the will interpreted the testator's inarticulate sounds to the draftsman of the will, who was a leading chancery lawyer. Had it been otherwise in that case, and had Mr. Henry Parish, the testator, been able to speak or to articulate, there can be no doubt that the view set forth in the powerful dissenting opinion delivered by the great Chief Justice Selden in Delafield v. Parish would have then prevailed. Matter of Raynor, 18 N. Y. Supp. 426.[1]

In Cheney v. Price, 90 Hun, 238, 37 N. Y. Supp. 117, the testator had an apoplexy prior to the making of his testamentary dispositions. Just as here in this 'cause before me, the condition of Mr. Cheney, there the testator, subsequent to his attack was variable, and even his doctor testified to his being irrational, and that in his opinion testator was incapable. But Mr. Cheney's will was nevertheless maintained, because on the day of the questioned act he was found to be compos mentis in law. The decision of the surrogate to the contrary was set aside by the Supreme Court.

In the Matter of Iredale, 53 App. Div. 47, 65 N. Y. Supp. 533, the testatrix there had suffered "a stroke" prior to making her will. Yet in that case the Appellate Division annulled the decree of the surrogate, who had found a want of testamentary capacity. There are numerous adjudged cases where the wills of those who had previously suffered from cerebral apoplexy were upheld. In re Bennett's Will (Sur.) 133 N. Y. Supp. 409. But no further citations of such cases are necessary to so plain a point.

It is apparent, then, that in law it is not the cerebral disturbance which an apoplexy always causes that incapacitates a would-be testator, but the fact that at the time of the making of the will such a testator is what the common law terms "non compos mentis." A person who has suffered from an apoplectic seizure may so far recover his mind as to be able in law to testamentate. In the Matter of the Will of Benjamin (Sur.) 136 N. Y. Supp. 1070, the will of one who had suffered one or more "strokes" was sustained by this court. When the will of Mrs. Benjamin again came to· trial in the Supreme·Court before a jury,. the testatrix was declared competent in

---

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 63 Hun, 635.

pais, and thus her will was ultimately sustained, and I believe justly sustained.

The legal definition of insanity in the jurisprudence of the common law rests primarily on Coke's interpretation of principles, which for centuries before had been applied with great refinement, in the testamentary causes in the ecclesiastical courts, by the English civilians charged with that jurisdiction. Co. Litt. 247a. Such principles were derived by the civilians from the Roman law. As part of the jurisprudence of England transferred to New York, and formally adopted by the state, we find Coke's paraphrase of non compos mentis of primary authority in the early testamentary causes occurring under the state government. Stewart's Ex'r v. Lispenard, 26 Wend. 299. Coke's own commentary was taken from the contemporary English law; but, as stated before, that contemporary law was derived from the English civilians, even Coke's well-known expression, non compos mentis, being but the mentis non compos of the jurist Ulpian (D. 20, 4, 'Qui test, facere possunt'). Therefore was it that Chancellor Kent, with his usual penetration, felt at liberty whenever necessary to go behind Coke to the Roman originals of the common law. Van Alst v. Hunter, 5 Johns. Ch. 148.

So very often did the highly instructed counsel of the early days of the republic resort directly to the Roman originals. See abstract of Ambrose Spencer's argument in Jackson v. King, 4 Cow. 207, 215, 15 Am. Dec. 354. If this reference to Roman law was so frequent at that day, it is apparent how much more frequent it must have been in the still earlier days of the common law, when the common law itself was much more silent than it now is concerning such refined conceptions. But I shall not attempt to refine away the great common law itself, for Coke's definition of mens insana in law continues to be the mainstay of our "common lawyers," as the disciples of the common law are correctly termed to contradistinguish them from the civilians. We find that Chief Justice Selden finally recurs to Coke's definition in the celebrated case involving the will of Mr. Henry Parish. 25 N. Y. 103.

Thus it is to Coke and not to the civilians that we must look in our law of testaments for legal capacity. In this cause before me I have accordingly followed the precedent thus laid down by Judge Selden, and my inquiry has been whether or not, from the proofs, Oscar Egerton Schmidt was or was not "compos mentis" on December 3, 1908, the day he made the codicil. Under the adjudications, binding in all the courts of the surrogates, I am constrained to find that Oscar Egerton Schmidt was compos mentis, or, in other words, of sound and disposing mind on the day and at the moment of executing the codicil now offered for probate.

[14] But one other issue remains to consider: Was testator the subject of undue influence, fraud, or restraint which here nullifies the codicil, as is charged by the contestant? This particular charge of contestant is not greatly pressed by counsel in the brief submitted; but the charge has been examined with the care which the testator's enfeebled condition of body at the moment of executing the codicil made imperative on the surrogate. It is unnecessary to discuss the rule regarding the burden of proof in testamentary causes, or on whom rests

onus probandi undue influences in a testamentary cause. By reason of some mere deviation of expression by the courts of this state the rule of this state on this point is sometimes thought not to conform with testamentary law generally. This I do not believe. In re Van Den Heuvel's Will, 76 Misc. Rep. 137, 136 N. Y. Supp. 1109, 1116. But wherever lies the burden of proving undue influence in this cause, no undue influence or fraud whatever has been established. Miller v. Miller, 150 App. Div. 604, 611, 135 N. Y. Supp. 773.

All the actors in the act of testamentation now to be tested in this cause were entirely respectable, law-abiding men. One of them was the subject of a particular eulogium by counsel for contestant, and of a specific disclaimer of record. This fact has been already alluded to in this opinion. Mr. Charles De Rham was one of the persons involved in the preparation of the codicil which his son in his professional capacity prepared, and they must have been the persons intended by the averments in the allegations of undue influence. Yet neither took a single benefit under the instrument in question. Their explanation of its preparation is clear, unreserved, and frank. The necessity for the codicil under the testator's altered pecuniary circumstances, alluded to before, was imperative upon him. Mr. Tompkins' connection with the preparation of the codicil was simply ancillary. It was Mr. De Rham and his son who were then directing testator's affairs as his agents. Mr. Tompkins had been practically superseded as chief director in charge. Mr. Tompkins' offices thereafter were largely due to the fact that he was then co-operating with Mr. Charles De Rham and the latter's son. If Mr. Charles De Rham is pronounced by contestant free of all censure in the matter of the codicil, Mr. Tompkins' conduct is inevitably in the same category. Either all or none are guilty of undue influence in procuring the codicil. If one is guilty all are.

[15] But quite irrespective of any such inference, no undue influence by any one soever was established in any way. Undue influence is a species of fraud. Undue influence imports coercion, compulsion, and an overreaching of a vicious kind. Now, none such was proved. The surrogate cannot find from the dubious proofs and doubtful circumstances submitted that such serious offenses against the law were committed on testator. Fraud and undue influence must be proved precisely, or inferentially by irresistible inferences, just as all other serious offenses against the law must be proved. The law never infers crime or delict when any other construction is possible. See the authorities cited by the surrogate in Matter of Campbell, 136 N. Y. Supp. 1089, 1104, 1105; and see Wilhelm v. Wood, 151 App. Div. 42, 135 N. Y. Supp. 930, and Voorhees v. Unger, 151 App. Div. 35, 135 N. Y. Supp. 113.

Doubtless the testator's change of testamentary intentions towards Mr. Oscar Egerton Stevens was a great hardship on Mr. Stevens. A self-denying man of a different type from that which testator was proven to be in this cause, one of less luxurious habit, would have husbanded his resources rather than be obliged to disappoint the fair expectations of a young man who was almost in loco filii to him. Such a man the testator was not. But with these considerations the surro-

gate has nothing to do. The duty of the surrogate is both narrow and plain. The proofs in this cause show the codicil propounded was the competent, free, and unrestrained act of a capable testator, and as such it is entitled to probate in this court.

Decree accordingly.